Willie Lee **GORDON** et al., Plaintiffs,

v.

**LABORERS' INTERNATIONAL UNION OF NORTH AMERICA** et al., Defendants.

The **ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC.,** Oklahoma Chapter-Builders Division, Plaintiff,

v.

**LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, LOCAL 612,** Defendant,

and

Laborers' International Union of North America, Intervenor.

Civ. Nos. 70–520, 72–544.

United States District Court, W. D. Oklahoma.

Nov. 1, 1972.

Charles W. Schwoerke, Oklahoma City, Okl., for plaintiffs in No. 70–520.

Maynard I. Ungerman, Tulsa, Okl., Robert J. Connerton and Jules Bernstein, Washington, D. C., for defendants, Laborers' International Union of North America and Oklahoma Laborers' District Council.

Leslie L. Conner of Conner, Little & Conner, Oklahoma City, Okl., for defendants, Local 612 of Laborers' International Union of North America and officers of Local 612, and as cross-complainant against Laborers' International Union of North America.

Edward E. Soulé, of Lytle, Soulé & Emery, Oklahoma City, Okl., for plaintiff in No. 72–544.

Charles W. Schwoerke, Oklahoma City, Okl., for defendant, Laborers' International Union of North America, Local 612.

Maynard I. Ungerman, Tulsa, Okl., Robert J. Connerton and Jules Bernstein, Washington, D. C., for Laborers' International Union of North America, intervenor.

## OPINION

BOHANON, District Judge.

These two civil actions were consolidated for final trial and disposition. No. 70–520 Civ. was instituted on October 20, 1970, by five members of Local 612, Laborers' International Union of North America, AFL–CIO, against the Local 612, the Oklahoma Laborers' Dis-

trict Council, and the Laborers' International Union of North America and certain named officers of Local 612.

The parties in these two consolidated cases will be referred to hereinafter as follows: Local 612, Laborers' International Union of North America as the "Local" or "Local 612"; Oklahoma Laborers' District Council as "Council"; Laborers' International Union of North America as "International"; Oklahoma Chapter-Builders Division of the Associated General Contractors of America, Inc. as "Chapter".

Plaintiffs in No. 70–520 Civ. sought an order authorizing the Local to withdraw as a member of the Council and to restore its rights as they existed prior to November 16, 1968, or alternatively, that the Local receive additional delegates to the Council so that it would be represented in direct proportion to its membership.

On May 4, 1972, the Court granted plaintiffs' motion for leave to amend their complaint. In the amendment plaintiffs alleged that on April 25, 1972, International had improperly imposed a trusteeship upon the Local in violation of Section 302 of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 462. Thereafter on May 8, 1972, after a hearing, the Court entered a preliminary injunction enjoining such trusteeship pending the conduct of a trial on the merits.

In civil action No. 72–544 commenced on August 8, 1972, by the Chapter against the Local, the Chapter sought a declaration under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, and the Declaratory Judgments Act, 28 U.S.C. § 2201, seeking a declaration of validity of a collective bargaining agreement entered into on March 13, 1972, between the Chapter and the Local. At the time the Chapter's lawsuit was filed, the first action had been processed, but not to a final conclusion.

International, on August 23, 1972 moved to intervene in the Chapter's suit (Civil No. 72–544) and to consolidate the two actions.

The Court found that the two cases arose out of a common set of facts and that they raised common questions of law and, therefore, on September 27, 1972, entered an Order consolidating and merging the causes for all purposes including trial and disposition.

A trial was conducted on September 29, 1972, at the conclusion of which the Court suggested the parties submit briefs, and the Court, having considered the briefs and the evidence submitted, as well as all exhibits, finds as follows:

1. International is a labor union consisting of approximately 600,000 members throughout the United States and Canada, and was organized in 1903. Since its organization, International has been governed by a written constitution, (Def. Ex. 2).[1] From the date of its organization, International has consisted of affiliated Locals and Councils. Councils are intermediate bodies made up of delegates representing Locals in accordance with the provisions of a Uniform District Council Constitution, which provides as follows with respect to representation of Local Unions:

Section 4. The representation of Locals affiliated with this Council shall be as follows: Two delegates for 500 members or less; three delegates for 501 to 1,000 members; four delegates for 1,001 to 2,000 members; five delegates for 2,001 to 4,000 members; six delegates for 4,001 to 8,000 members; seven delegates for 8,001 or more members.

Article XIX of the International's Constitution provides in part as follows:

District Councils

Section 1. The General Executive Board, or the General President and General Secretary-Treasurer, shall authorize the issuance of District Council charters in such areas as, in their

---

1. References to Exhibits introduced by the International are designated as "Def.Ex. ——."

judgment, the best interests of the International Union, Local Unions and members thereof, demand.

Section 2. Such charters may be issued:

(a) Upon application of a number of affiliated Local Unions in an area when it is deemed advantageous and beneficial to said Local Unions to combine their economic power, effort and strength into a unit which would tend to enhance, promote and conserve their welfare and interest and that of their members; or

(b) When the General Executive Board, or the General President and General Secretary-Treasurer, upon examination of conditions as they may exist in a given area, believe that the welfare and interest of a group of Local Unions and their members would be enhanced, promoted and conserved by the issuance of a District Council charter.

Section 3. When a District Council charter is issued, all Local Unions within its territorial and/or craft jurisdiction shall affiliate and remain affiliated with said District Council.

2. On October 7, 1968, an application was filed with the International by seven (7) of its nine (9) Locals in Oklahoma requesting the issuance of a Council charter and the establishment of an Oklahoma Council, (Def. Ex. 13). On October 9, 1969, a Council charter was issued by International establishing the Oklahoma Laborers' District Council having territorial jurisdiction over the entire State of Oklahoma.

Pursuant to the provisions of Article II, Section 2 of the Uniform District Council Constitution, a Council has power to

. . . negotiate, bargain for and enter into undertakings and agreements with employers, for and in behalf of its affiliated Local Unions and to enforce and police the observance thereof by employees and employers, Local Unions and their members and when, after due deliberation, it believes and deems it necessary, to take such proper and lawful economic action as may be required to accomplish and effectuate the welfare of its affiliated Local Unions and members.

3. For some years in the past, each Local in Oklahoma affiliated with the International engaged in collective bargaining on behalf of its members without any particular regard to the impact of such bargaining upon other Locals within Oklahoma and without any coordination among such Locals regarding wages, fringe benefits, and other terms and conditions of employment.

At the 1966 Convention of International, delegates from affiliated Locals and Councils throughout the United States and Canada adopted uniform collective bargaining goals for all affiliates and the entire membership of International. These included provisions for health and welfare, pension and training coverage under collective bargaining agreements.

4. It was in order to achieve these and other goals within Oklahoma that the Oklahoma Council was established in 1969. Local 612 originally opposed the establishment of the Council. However, delegates of Local 612 have participated in virtually all Council meetings since its establishment.

From the time of its creation, at each Council meeting steps to implement an overall statewide collective bargaining program were discussed and outlined. Under the program the Council was to negotiate a contract on behalf of each Local which would effectuate the Council's bargaining goals. The contract was to contain health and welfare, pension and training program coverage for members of all Locals within the Council. Delegates from Local 612 were present at all of the meetings of the Council at which these bargaining proposals and plans were discussed and prepared. (Def. Ex. 5).

5. The Council's program to establish statewide conditions of employment including health and welfare, pension and

training coverage proved successful in all respects except insofar as Local 612 was concerned. The eight other Locals within the state have all negotiated collective bargaining agreements through the Council containing such coverage and in addition all Local Union agreements now include a common expiration date of June 1, 1973.

6. Although the principal officers of Local 612 were aware of the Convention mandates for health and welfare, pension and training coverage, participated in Council meetings and were aware of the Council's constitutional authority to negotiate for and on behalf of all affiliated Locals, none of the officers of Local 612 took the necessary steps to negotiate by and through the Council.

Instead, in late 1971 the officers of Local 612 receded entirely from the scene and allowed negotiations with the Chapter to proceed through a group of members who were elected pursuant to a resolution which the officers conceded to be improper. Although the officers had full knowledge that some members of the Local were negotiating with the Chapter in direct contravention of provisions of the Union's Constitution, they failed to notify the Council of the actions of the unauthorized negotiating committee, nor did they take any steps to prevent the purported negotiations from continuing.

7. As heretofore found and as shown by the pleadings, Chapter means and includes the Associated General Contractors of America, Inc., Oklahoma Chapter-Builders Division, which includes all nine District Councils of International in Oklahoma. Mrs. Ruth Ann Leslie, at all times herein concerned, was manager of the Chapter, and on February 7, 1972, Mr. Jack J. Ridenour, Secretary-Treasurer of the Council, wrote Mrs. Leslie, as Manager of the Chapter, to advise that the bargaining committee of the Council was prepared to meet with the Chapter's negotiating committee regarding the nego-

tiation of certain collective bargaining agreements covering Laborers' Locals in Oklahoma, including Local 612, (Def. Ex. 19). This was notice to the Chapter that the Council was the bargaining agent for Local 612. Notwithstanding this notice received from Mr. Ridenour, the Chapter in disregard thereof proceeded to enter into a collective bargaining agreement with the Local 612 bargaining committee on March 13, 1972.

8. Since March 29, 1971, under the provisions of the Economic Stabilization Act, as originally enacted, 84 Stat. 799, and as amended, 85 Stat. 743, and accompanying executive orders and administrative regulations, collective bargaining agreements negotiated by employers and unions in the construction industry have been required to be submitted for approval to so-called "craft boards" set up by the national construction industry and national craft unions before such contracts could be implemented. Such craft boards have been authorized to approve or disapprove proposed contracts on the basis of guidelines set down by a higher level tripartite board known as the Construction Industry Stabilization Committee ("CISC" hereinafter). (Pl. Exs. 26–30).[2]

9. Pursuant to Executive Order 11588, established to implement the stabilization program in the construction industry, a Laborers' National Craft Board ("Craft Board" hereinafter), was established consisting of an equal number of representatives of the International and of employer groups, including the Associated General Contractors of America, which is the parent group of the Chapter.

10. In accordance with the foregoing regulatory scheme, on March 13, 1972, a communication was sent to the Craft Board by the Chapter and Local 612, submitting the contract as negotiated by them for the Board approval. (Pl. Ex. 20).

11. On March 20, 1972, Peter Fosco, General President of International,

___

2. References to Exhibits introduced by the Chapter have been designated as "Pl.Ex. ——."

received a letter from R. P. Vinall, Manager of International's regional office which has responsibility for the States of Oklahoma, Texas, and New Mexico. In his letter, Vinall advised General President Fosco of the foregoing developments and he recommended that the Local Union be placed under trusteeship, (Def. Ex. 5).

On March 27, 1972, the International's General Secretary-Treasurer sent a notice to the officers and members of Local 612 regarding the conduct of a hearing to determine whether Local 612 should be placed in Trusteeship. The notice of hearing specifically enumerated the grounds upon which the General President proposed to rely upon in support of the imposition of trusteeship: the fact that the purported agreement negotiated between Local 612 and the Chapter covered a three-year term ending June 1, 1975; that the purported agreement failed to contain any provision for health, welfare or training, contrary to the policies and programs developed and adopted by the Council; that the execution of the purported agreement has impeded and delayed coordination of collective bargaining and the restructuring of statewide bargaining in Oklahoma to the detriment of other Laborers' Locals in the State; that the agreement reached incorporated a wage settlement which jeopardized the settlements of other Laborers' Locals as well as the settlements of other crafts; and that the foregoing conduct violated various provisions of the International, Council and Uniform Local Union Constitutions. The Local received notice of the hearing, and three of its officers were present and participated at the April 10 hearing, (Def. Ex. 1).

At the conclusion of the hearing, the International's Hearings Panel reviewed the transcript and exhibits and prepared a report consisting of findings of fact and a recommendation that Local 612 be placed under the supervision and trusteeship of the International. That report was submitted to the General Executive Board of the International at its April 20, 1972, meeting, and the Board unanimously voted to adopt the Hearings Panel's recommendation, (Def. Ex. 5).

Immediately after the Board's decision, the General Secretary-Treasurer of International prepared and sent a notice to the Local containing the Hearings Panel's report and recommendation and the decision of the General Executive Board thereon, (Def. Ex. 5). At the same time, the General President sent a letter to the officers and members of Local 612 notifying them of the General Executive Board's decision and indicating that he was exercising his authority under Article IX, Section 7 of the International Constitution, by placing the Local under trusteeship, (Def. Ex. 5).

12. By letter dated June 29, 1972, from V. W. Reed, Labor Co-Chairman and Paul B. Richards, Management Co-Chairman of the Craft Board, the Chapter was advised that the Board was rejecting the proposed agreement, (Def. Ex. 17). In so doing, the Board declared in part as follows:

> The proposed agreement failed to meet the Craft Board criteria for Oklahoma on the following counts. First, the agreement covers a three-year period and would stand as an absolute bar to necessary restructuring. Second, the Agreement fails to narrow the economic gap between Tulsa and Oklahoma City and indeed, widens the margin. Third, we have reservations concerning the fact that no provisions have been made for welfare and pension benefits, even though the rest of Oklahoma is covered by agreements calling for these benefits negotiated by the Oklahoma Laborers' District Council and the Oklahoma Chapter, AGC.

In addition, the Board advised the Chapter that it was referring the entire file in the case to the CISC "for such action—if any—as it may wish to take."

13. By letter dated July 13, 1972, John T. Dunlop, Chairman of the CISC advised the Craft Board as follows re-

garding the proposed contract between the Chapter and Local 612:

Gentlemen:

The Construction Industry Stabilization Committee at its meeting of July 13 reviewed the letter of June 29, 1972 from the Craft Board to the Oklahoma Builders Chapter, AGC, Mrs. Ruth Ann Leslie, Manager, and the attached file. The Committee reviewed also the series of cases involving the Laborers and other basic crafts which it has handled or has pending in the State of Oklahoma, and, in connection with these cases, has reviewed the wage and fringe benefit data it has compiled for all of the crafts in major Oklahoma localities, in particular, Tulsa, Oklahoma City, Lawton, Bartlesville, Muskogee, McAlester, Ponca City, Norman and Clinton.

Executive Order 11588, which established the Construction Industry Stabilization Committee and authorized the establishment of craft boards, particularly charged the Committee with the stabilization of wages consistent with and in furtherance of effective collective bargaining in the construction industry. The criteria of the Committee issued on January 28, 1972 in agreement with the Pay Board. Specifically provide that the Committee, may give special consideration "to agreements which provide for significant changes in the geographical structure of bargaining, including the development of wage zones under one agreement, where such changes would promote the stabilization of collective bargaining and the effective utilization of manpower and management resources." There is little doubt that to a significant degree inflation in the construction industry from 1966 through 1971 was substantially enhanced by a geographical structure of bargaining which has become archaic in many localities and areas, which inhibits the flow of manpower, management resources and equipment from one locality to another and which removes the strike and lockout as effective methods of resolving disputes, since contractors and men move so readily with improved transportation from one city to another.

In a number of states the national unions and the national employer associations, working through craft boards, have negotiated or assisted in the negotiation of agreements with substantially broader geographical coverage, in order to remedy the defects of the older geographical structure of bargaining mentioned in the previous paragraph. The Construction Industry Stabilization Committee is strongly of the view that these broader agreements have not only contributed to short-run wage stabilization but constitute a significant contribution to the long-run health of the construction industry in the national interest. It may also be useful to point out that under the substantive policies of the CISC, issued jointly with the Pay Board on January 28, 1972, "no agreement is automatically entitled to the general pay standards, or the exceptions thereto, of the Pay Board." One of the reasons for this policy is that in the process of restructuring bargaining in broader geographical districts it may be important over a period of one or two years to provide for larger increases in some communities than in others to bring rates into equality or to provide for reasonable wage zones for each sub-unit of territory.

The Committee, on examining the file submitted to it by the Laborers Craft Board in this matter and reviewing the full range of data and cases in Oklahoma, concludes that the Laborers Craft Board acted appropriately in its refusal to approve the agreement submitted by Laborers Local Union 612 of Oklahoma City and the Oklahoma Chapter—Builders Division, Associated General Contractors of America, Inc. The Construction Industry Stabilization Committee unanimously requests that the Oklahoma Chapter—

Builders Division, AGC of America, meet with the Laborers District Council, of which Local Union 612 is a part, to review the agreement which was rejected by the Craft Board to take into account the objections to the agreement pointed out by the Craft Board in its letter of June 29 to Mrs. Ruth Ann Leslie and to seek to negotiate towards a more coherent wage rate structure for Laborers in Oklahoma. Of course, any renegotiated agreement would have to be submitted through the Craft Board to the Construction Industry Stabilization Committee for approval. (Def. Ex. 18).

14. At the direction of the Court, a duly noticed meeting of Local 612 was conducted on August 21, 1972, supervised by Charles R. Jones, Magistrate, Western District of Oklahoma, at which the members were polled by secret ballot with regard to the following question:

Do you want the Laborers' District Council to negotiate the Laborers' contract for the Oklahoma City area in accordance with the Laborers' International Union Constitution?

The vote was conducted after a statement of views by both sides. The result of the vote was 157 voting yes; 45 voting no; void ballots, one.

15. By letter dated August 31, 1972, Edward E. Soulé, counsel for the Chapter, advised the CISC and Judge George H. Boldt, Chairman of the Pay Board established under Executive Orders 11627 and 11640, that it was the position of the Chapter that the decision of the Craft Board was illegal and that, unless it was reversed, the Chapter would seek judicial relief, (Pl. Ex. 22). By letter dated September 15, 1972, from Gilmore S. Wheeler, Director, Operations Control of the Pay Board, Mr. Soulé was advised that the subject of his letter fell within the jurisdiction of the CISC and that future communications regarding the matter should be addressed directly to it, (Pl. Ex. 23).

16. All of the parties were fully aware that there could not be a binding contract between Local 612 and Chapter unless the same was submitted to and approved by the Craft Board. This is evidenced by the fact, as shown by all of the evidence, that the alleged contract of March 13, 1972, between Chapter and Local 612 was jointly submitted to the Laborers' National Craft Board in Washington for approval. (Tr. 16–17). This fact is further evidenced by the testimony of Mr. W. H. Henry, a member of the Chapter's negotiating committee in 1972, who testified at the September 29, 1972, hearing that it was understood by the parties not to be a valid contract, but the same was subject to the Craft Board's approval and the Craft Board did not approve it, (Tr. 22–23). Furthermore, Mr. Henry testified that the alleged contract had not been put into effect. (Tr. 23).

From the findings above the Court concludes as follows:

1. The amended complaint filed by several members of Local 612, as well as a cross-complaint against International filed by the defendant officers of the Local, allege a violation of Section 302 of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 462, which declares as follows:

Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and by-laws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.

The foregoing provision is a part of Title III of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 401 et seq., which was enacted by Congress to regulate the imposition and administration of trusteeships by parent nation-

al and international unions over their subordinate affiliates and locals.

■ The court concludes that the decision of the International to impose trusteeship upon Local 612 was well within the permissible purposes of Section 302 of the Act in that the trusteeship clearly seeks to assure that the Council and the Local will hereafter properly perform their duties as bargaining representatives and that democratic procedures will be restored within the Local.

■ Further, the establishment of coordinated bargaining and the development of health and welfare, pension and training programs as bargaining goals, are common and legitimate union objects. And the blatant and deliberate failure of the Local's officers to abide by internal union rules regarding the manner and means for advancing and achieving such goals constitutes a permissible basis for imposing trusteeship both under the Act as well as under the International's Constitution.

With regard to the question of allowable purposes under Title III, in addition to the express provisions of Section 302 Senate Report No. 187 on S. 1555 notes:

> Section 202 (section 302 as presently enacted) of the bill sets up two standards for testing the legality of a trusteeship. First, the trusteeship must conform to the constitution and by-laws of the labor organization. Second, the trusteeship must be imposed for one of the three following purposes—
>
>> correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.
>
> The bill does not specify in detail all of the reasons for which a trusteeship may be imposed. For instance, the elimination of Communist or other forms of subversion has long been rec-

ognized by the courts as a justification for imposing a trusteeship. More rigid standards than these might prevent international intervention when fully justified. U.S.Code Cong. & Admin.News 1959, p. 2334.

The aforementioned reflection of legislative intent, when focused upon the previously recited facts giving rise to the General Executive Board's decision to impose trusteeship, clearly indicates that the decision to impose trusteeship was not only founded upon statutory grounds, but also constituted the Board's honest judgment, based upon the facts revealed, that the imposition of trusteeship was necessary.

2. The other claim advanced by the Local's officers and several of its members appears to be that under the "equal rights" provision of Section 101(a)(1) of the Act, 29 U.S.C. § 411, Local 612 could not be compelled to join the Council since it would not receive proportional representation with regard to its delegate strength within the Council.

■ The foregoing claim has been disposed of by the Supreme Court's decision in American Federation of Musicians v. Wittstein, 379 U.S. 171, 85 S.Ct. 300, 13 L.Ed.2d 214 (1964). In *Wittstein*, it was contended that an increase in union dues enacted at a convention of an international union violated Section 101(a)(3)(B) of the Act, 29 U.S.C. § 411. But the Court held that a weighted voting system pursuant to which delegates cast a number of votes equivalent to the membership of the local union from which they were elected was as consistent with Section 101(a)(3)(B) as was a system in which each delegate cast one vote regardless of the number of local union members represented. In so holding, the Court declared as follows:

> . . . Section 101(a)(3)(B) is a part of Title I, entitled the "Bill of Rights of Members of Labor Organizations." This Title guarantees to every member of a labor organization equal rights and privileges to vote, to

attend meetings, and to participate in the deliberations and business of such meetings. Section 101(a)(3)(B) forms a part of this framework by requiring participation by all members, either directly or through their elected representatives, on certain union matters thought to be of special importance. *We find nothing to indicate that Congress thought this objective would be better fulfilled by allowing a delegate to cast one vote, regardless of the size of his constituency, than by permitting him to cast a vote equal to the number of members he represents* . . . Section 101(a)(3)(B), as well as Title IV, authorizes a representative system of government and does not require a town meeting for action by an international or national union. (Emphasis added.) (379 U.S. at 181, 182, 85 S.Ct. at 306.)

Further, the Labor Department which administers numerous provisions of the Act has ruled that proportionate or weighted voting is not required under the Act:

> There is no indication that Congress intended, in enacting Title IV of the Act (dealing with union elections), to require representation in delegate bodies of labor organizations to reflect the proportionate number of members in each subordinate labor organization represented in such bodies. Questions of such proportionate representation are determined in accordance with the labor organization's constitution and bylaws insofar as they are not inconsistent with the election provisions of the Act. Congress did not attempt to specify the organizational structure or the system of representation which unions must adopt.[3]

Thus, not only is there nothing to indicate that Congress intended to impose a system of voting or representation on unions which would undermine their long-established traditions of representative trade union government. In fact,

the court concludes that it was the intent of Congress to leave intact such well-established union practices and procedures.

As the Fourth Circuit declared in Parks v. IBEW, Local 28, 314 F.2d 886 (4th Cir. 1963), cert. den., 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963):

> Although state courts have traditionally exercised some supervisory function over local-international relations, and the federal courts are now empowered to intervene in some areas under a number of provisions of the LMRDA, federal judges may not, on their own, cure whatever deficiencies they may think exist in the pattern the parties have fashioned. (Fn. omitted.) (314 F.2d 886, 907.)

Plaintiffs seek an order herein which would require the Court to re-write provisions of the Uniform District Council Constitution which have been in existence for approximately sixty-six years. But as was declared by the United States District Court for the Northern District of Alabama in Ragland v. United Mine Workers, 188 F.Supp. 131, 133 (1960):

> This court is of the . . . opinion that the 'equal rights' provision of the Act was not intended by Congress to change the International organizational structure of unions. . . .

3. The individual plaintiffs also appear to challenge the authority of the Council under Article II, Section 2(a) of the Uniform District Council Constitution to

> . . . negotiate, bargain for and enter into understandings and agreements with employers, for and in behalf of its affiliated Local Unions and to enforce and police the observance thereof by employees and employers, Local Unions and their members and when, after due deliberation, it believes and deems it necessary to take such proper and lawful economic ac-

---

3. United States Department of Labor, Technical Assistance Aid No. 5, Electing Union Officers (rev. June 1963).

tion as may be required to accomplish and effectuate the welfare of its affiliated Local Unions and members.

That Congress was not concerned in the enactment of the Act with what the relationship between local unions, intermediate bodies and a parent national or international union would be, particularly with respect to collective bargaining matters, was confirmed in Parks v. IBEW, Local 28, *supra*. In *Parks* the Fourth Circuit held that a parent union was fully within its rights in dissolving an affiliated local union and chartering another in its place on the ground that the dissolved local had refused to abide by a decision and order of the President of the International Union concerning the negotiation of collective bargaining agreements which did not contain certain provisions required by the parent union. The court declared with respect to issues similar to those presented herein:

> What has been granted the parent body as its proper province in collective bargaining and what has been retained by the local—perhaps it is more accurate to put it the other way: what has been retained by the parent and what has been granted to the subordinate—is a matter of internal government resting upon the contract the local and its members have made in accepting a charter from the parent. This court is advertent to the prevailing policy favoring internal union democracy and, of course, it recognizes that in appropriate cases courts may intervene to redress grievances arising from the imposition of discipline upon locals or individual members; but, in the absence of specific legislation, it does not lie within the authority of a court to give effect to its general preferences between international power and local autonomy in matters of collective bargaining. Questions as to how relations between an international and its local might best be regulated are for internal settlement or for Congress, which possesses the

> legislative power. Judges lack that power even when they are convinced of the desirability of improvements in the law. (Footnotes omitted.) (Parks v. IBEW, *supra*, 314 F.2d at 906.)

See also Ranes v. Office Employees, Local 28, 317 F.2d 915 (7th Cir. 1963) ; Dunne v. Hoffa, 231 N.Y.S.2d 352 (N. Y.Sup.Ct.1962).

■ Under the provisions of Article II, Section 2(a) of the Council Constitution, the International properly decided that the negotiation and implementation of collective bargaining agreements on an area-wide basis through the vehicle of a Council constitutes a desirable objective for the purpose of obtaining uniform standards and conditions of employment for its members.

■ 4. Insofar as the suit filed by the Chapter (72–544 Civ.) is concerned, it was instituted pursuant to Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, which authorizes the federal district courts to entertain "[s]uits for violation of contracts between an employer and a labor organization . . . without respect to the amount in controversy or without regard to the citizenship of the parties." It is well established that suits may be filed under this provision for a declaration of rights under a collective bargaining agreement even in the absence of allegations of express contractual violations. See, e. g., Black Clawson Co. v. International Association of Machinists, 313 F.2d 179, 181–182 (2nd Cir. 1962). Accordingly, the court concludes that it has jurisdiction over the Chapter's declaratory judgment action.

With regard to the substantive law applicable to such suits, in Textile Workers v. Lincoln Mills, 353 U.S. 448, 456–457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957), the Supreme Court has declared

> . . . that the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion

from the policy of our national labor laws. . . . The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. . . .

It is clear that in the instant case the task of fashioning the applicable "common law of labor contracts," see United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 579, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), must be undertaken in contemplation of the imposition of comprehensive economic controls over the economy by the Federal government. See Amalgamated Meat Cutters v. Connally, 337 F.Supp. 737, 763 (D.C.1971).

Under Section 3(a) of Executive Order 11588 (Pl. Ex. 26), issued by President Nixon on March 29, 1971, to stabilize wages in the construction industry, the Craft Board was required and has authority to examine "every collective bargaining agreement negotiated on or after the date of this order and . . . determine, in accordance with the criteria established in Section 6 whether wage and salary increases in the agreement were acceptable and may thus be approved." Further, Section 4(c) of the Order declares that "[u]nless and until an increase in wage or salary has been approved in accordance with the provisions of Section 3(a) and 4 of this order, it shall be a violation of this order to put such wage or salary increase into effect."

And Section 7 of the Order declares that "[t]he parties to a labor contract negotiated in the construction industry shall promptly submit that contract to the appropriate board . . . ."

At the time the alleged contract was signed, the parties were aware that the contract was subject to review by the Laborers National Craft Board. Indeed, it was submitted to the board for review by the Chapter and Local 612 in accordance with the Order. (Pl. Ex. 20).

Accordingly, the court concludes that the contract was entered into by the parties subject to the condition subsequent that it be approved by the Craft Board and/or the CISC and that, by reason of their refusal to approve the agreement, it was rendered void and of no force and effect.

The Chapter appears to suggest that this court should ignore the action of the Craft Board and CISC with respect to this contract on the ground that those agencies acted in excess of their powers. However, the court concludes that such action was wholly consistent with the authority of these agencies under the relevant legislation and regulations.

The Court further concludes, contrary to the contention of the Chapter, that in examining and reviewing proposed collective bargaining settlements, both the Craft Board and the CISC are authorized to disapprove agreements and make recommendations with regard to bargaining subjects which go well beyond the limited area of wages. Hence Section 11(b) of Executive Order 11588 declares that "[t]he term 'wage or salary' shall mean, for the purpose of this order, all wage or salary rate schedules and *economic benefits* established pursuant to a collective bargaining agreement in the construction industry." (Emphasis added). To adopt the notion advanced by the Chapter that the agencies are limited solely to reviewing the wage provisions of collective bargaining agreements would require the court to close its eyes to the express provisions of the control legislation and implement-

**836**

ing orders as well as to the realities of collective bargaining in the construction industry. Hence, if the powers of these agencies were to be read narrowly, parties to collective bargaining agreements might avoid the strictures of the controls by merely concentrating on obtaining benefits outside the narrow ambit of hourly wages. But such was clearly not the intent of Executive Order 11588 nor of the other related governing regulations which sought to empower these agencies to impose effective controls upon collective bargaining in the construction industry. Indeed, in the instant case, the agencies indicated their concern regarding such bargaining subjects as fringe benefits, contract duration as well as the impact of the settlement on employment in surrounding geographical areas.

An appropriate judgment will be entered.

### JUDGMENT

Based upon the Opinion of the Court this day filed, it is

The judgment and decree of the Court

1. That the preliminary injunction entered in Case No. 70–520 Civ. on May 8, 1972, is hereby dissolved, and the parties are restored to their respective positions as of the time the preliminary injunction was issued.

2. That the purported contract of March 13, 1972, between Local 612 of Laborers' International Union of North America and The Associated General Contractors of America, Inc., Oklahoma Chapter-Builders Division is void and unenforcible.

Costs in Case No. 70–520 Civ. are assessed against Local 612 of Laborers' International Union of North America; and in Case No. 72–544 Civ. against The Associated General Contractors of America, Inc., Oklahoma Chapter-Builders Division.