## AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA ET AL. *v.* WITTSTEIN ET AL.

No. 27. Argued November 16, 1964.—Decided December 7, 1964.

*Henry Kaiser* argued the cause for petitioners. With him on the brief were *Eugene Gressman, George Kaufmann, David I. Ashe* and *Jerome H. Adler.*

*Godfrey P. Schmidt* argued the cause and filed a brief for respondents.

Briefs of *amici curiae,* urging reversal, were filed by *Solicitor General Cox* for the United States, and by *J. Albert Woll, Robert C. Mayer, Theodore J. St. Antoine* and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations.

Mr. Justice White delivered the opinion of the Court.

The issue presented in these suits is whether § 101 (a) (3) of the Labor-Management Reporting and Disclosure Act of 1959 [1] providing that the dues of an international union "shall not be increased . . . except . . . by majority vote of the delegates voting at a regular convention" prohibits the vote of delegates at a national convention of the union, as authorized by its constitution, from being weighted and counted according to the number of members in the local that the delegate represents.

---

[1] 73 Stat. 519, 522, 29 U. S. C. § 411 (a) (3) (1958 ed., Supp. V).

"(3) Dues, initiation fees, and assessments.—Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except—

"(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot; or

"(B) in the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations, (i) by majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization, pursuant to express authority contained in the constitution and bylaws of such labor organization: Provided, That such action on the part of the executive board or similar governing body shall be effective only until the next regular convention of such labor organization."

## I.

The petitioner American Federation of Musicians (Federation) is an international labor organization comprising 675 locals in the United States and Canada. As with numerous other national and international labor organizations having many scattered locals of varying size, Federation's constitution and bylaws have long authorized alternative methods of ascertaining the vote of the delegates representing the locals at a union convention. Each local is entitled to one delegate for each 100 members or major fraction thereof, not to exceed three delegates from any one local. Federation's bylaws permit a voice vote of the delegates attending a convention in all cases, which is the method often used on routine noncontroversial matters. When amendments to the union constitution or bylaws are at issue, however, the delegates representing the locals, upon a roll call vote, may cast as many votes as there are members in the respective locals. A roll call vote is required upon the demand of 10 delegates or five locals. All amendments to the bylaws and constitution approved by a roll call vote are required under the constitution to be referred to a convention committee which may approve or veto the proposal.[2]

---

[2] Article 5 of Federation's constitution provides:

"All Locals of this Federation of one hundred and fifty members or less shall be entitled to one delegate. All Locals shall be entitled to one delegate for each one hundred members or a major fraction thereof, not exceeding three delegates for any one Local, but each Local shall be entitled to one vote for each one hundred or major fraction thereof, but no Local shall cast more than ten votes, and the number each Local is entitled to shall be computed from the last report made on January 1st before the convention by the Local, according to the books of the Treasurer. On questions affecting a change in the laws, each Local may, upon roll call, cast as many votes as it has members,

At petitioner's 1963 annual convention, a resolution increasing the per capita dues of all members, approximately 255,000, was submitted to the delegates. After the chairman ruled that two voice votes of the delegates were inconclusive, a delegate speaking on behalf of five locals requested a roll call vote in accordance with Federation's constitution. The rules governing a roll call vote were explained to the delegates. Delegates were to cast as many votes as there were members in the local that they represented. If the delegates from a given local were in disagreement, the total votes of that local were to be divided among the delegates. The roll call was taken and the recommendation carried by some 44,326 votes, with less than one-half of the delegates present voting in favor of the proposal.

Respondents, members of several locals whose delegates voted for or against the resolution at the convention, brought these suits against Federation and one of its locals to have the resolution declared null and void and its implementation enjoined. In the District Court, summary judgment in the consolidated actions was rendered for the respondent union members. 223 F. Supp. 27 (D. C. S. D. N. Y.). Finding that the material facts about the enactment of the dues resolution in regard to the issue under § 101 (a)(3)(B) were not in dispute, that court ruled that weighted voting did not comply with § 101 (a)(3)(B)'s requirement of approval by "majority vote of the delegates voting at a regular convention." A divided Court of Appeals affirmed. 326 F. 2d 26 (C. A. 2d Cir.). Although noting that weighted voting "is to all

---

as per book of the Treasurer, A. F. of M. All laws so passed shall be referred to a convention committee consisting of the Executive Board, A. F. of M., and chairmen of all committees, who may sanction or veto same, their action to be final. Roll call shall be demandable and had under this Article on demand of ten delegates or five Locals."

appearances the most 'democratic' method, in the sense that each member is duly 'represented,' " it held that the plain language of § 101 (a)(3)(B) requires that each delegate be allowed but one vote regardless of the number of members he represents. The question being an important one of first impression under the LMRDA, we granted certiorari. 376 U. S. 942. We hold that § 101 (a)(3)(B) does not prohibit a weighted-voting system under which delegates cast a number of votes equal to the membership of the local union from which they are elected.

## II.

Under § 101 (a)(3)(B) an international union may increase membership dues or levy an assessment by majority vote of the members voting in a membership referendum, by majority vote of the members of the executive board, effective, however, only to the next regular convention, or "by majority vote of the delegates voting at a . . . convention." The quoted language, it is said, authorizes only one system of voting: a head count of the delegates at a convention. Just as each member and each executive board member is entitled to one vote, so too each delegate may cast only his single vote. There cannot be a majority vote of the delegates voting, the argument proceeds, unless a delegate casts but one vote, no more or less, and the affirmative votes cast add up to a majority of the delegates voting. So far the argument is based solely upon what is said to be the literal meaning of the statutory language; there is no suggestion that § 101 (a)(3)(B) embodies an accepted or preferable system of representation by delegates or that the provision requires any set number of delegates at a convention or any particular relationship between the size of the local and the number of representatives at the convention.

We do not think this is the only fair import of the language in § 101 (a)(3)(B). The section requires a majority *vote* of the delegates voting. It does not state that a dues increase must be approved by a *majority of the delegates voting* at a convention. The respondents' construction renders the key word "vote" entirely superfluous, although that word describes what is to be counted to determine a majority. The provision on its face prescribes only by whom the vote must be cast—a delegate to a convention—and the proportion of votes needed for passage—a majority of the votes cast. The statute does require that those voting at a convention be delegates, but it says nothing about the number of votes each delegate may cast. Where the "vote" cast at a convention is weighted according to the number of people the delegate represents, that vote, we think, is a vote of a delegate. We believe that a majority vote so determined in favor of a dues increase is approval by majority vote of the delegates voting at a. convention.

Whatever doubts may be left by sole and plenary reliance on plain meaning are fully resolved by consideration of the legislative history behind § 101 (a)(3)(B) and of other provisions of the LMRDA. This section had its genesis in Senator McClellan's proposals in S. 1137, which would have required a "general vote" on rules relating to the rate of dues and initiation fees and would have required that the vote of delegates at a convention "be numerically- equivalent, or proportionate, to the number of the members of [each] constituent unit." [3] I Leg. Hist. 269, 278. Although S. 1137 was not reported out by the Senate Committee on Labor and

---

[3] S. 1137, 86th Cong., 1st Sess., I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, 260, 269, 278 (1959) (hereafter Leg. Hist.).

Section 101 (5) of S. 1137 provided:

"Freedom from arbitrary financial exactions.—Rules relating to the rate of dues and initiation fees, or the levying of any special

Public Welfare, Senator McClellan's requirement that the voting strength of convention delegates be proportionate to the size of their constituency is significant for the reason that it was the outgrowth of the extensive hearings held by the McClellan Committee [4] which uncovered substantial evidence of various forms of internal misgovernment and abuses in several labor organizations. The findings of this committee became the primary basis for the many bills that followed its investigations,[5] an

or general assessment, may be adopted or amended only after due notice and by general vote."

Section 104 (2) of S. 1137 provided:

"VOTING AT CONVENTIONS.—All delegates elected or designated by the constituent units of an international labor organization . . . to represent such constituent unit at any meeting or convention held by such labor organization shall have a vote in all elections for officers and upon other matters brought before such meeting or convention for action or ratification by vote, which vote shall be numerically equivalent, or proportionate, to the number of the members of such constituent unit as disclosed by the roster of members . . . ."

[4] The Select Committee on Improper Activities in the Labor and Management Field.

[5] That the findings of the McClellan Committee were significant in the drafting of the LMRDA is well reflected in the Committee Reports.

"The committee reported bill is primarily designed to correct the abuses which have crept into labor and management and which have been the subject of investigation by the Committee on Improper Activities in the Labor and Management Field for the past several years. . . . The committee-reported bill is based on the legislation approved by the Senate last year and thus it too implements the remaining recommendations of the McClellan committee." S. Rep. No. 187, 86th Cong., 1st Sess., at 2, I Leg. Hist. 397, 398.

"The committee reported bill is primarily intended to correct the abuses which have crept into the labor and management field and which have been the subject of investigation by the Senate Committee on Improper Activities in the Labor and Management Field for the past several years." H. R. Rep. No. 741, 86th Cong., 1st Sess., at 1, I Leg. Hist. 759. See also 105 Cong. Rec. 15530, II Leg. Hist. 1566 (remarks of Congressman Griffin).

amalgam of which ultimately became the LMRDA. In light of the fact that then as now many large unions had provisions for weighted voting by delegates at a convention, it is very clear that weighted voting was not thought to be one of these abuses or forms of misgovernment.[6]

Senate bill No. 1555, the Kennedy-Ervin bill, was favorably reported out of the Senate Committee on Labor and Public Welfare without any Bill of Rights for union members, now Title I of the Act, of which the provision relating to dues is a part.[7] Senator McClellan soon introduced a comprehensive Bill of Rights provision as an amendment to S. 1555, which was adopted in the Senate by a vote of 47 to 46.[8] In respect to financial exactions, this amendment placed a flat limit on initiation fees and required for approval of a dues increase a majority vote of the members in the case of a local union and a "majority vote of the delegates present" at a general meeting in the case of a national or international union. It is not without significance that this language is susceptible

---

[6] Leiserson, American Trade Union Democracy 129–132 (1959).

"Except in the few unions where locals are entitled to but one delegate with one vote, the number of votes in a convention is always greater than the number of delegates. Although proxy voting is generally prohibited (Longshoremen and Blacksmiths are exceptions), every convention delegate casts not only his own vote, but a share of the voting strength of the local union he represents as well. This voting strength varies with the size of the locals, and the total vote of a local union may be divided among its delegates or one of them may cast all its votes. The basis of representation and the methods of basing voting strength on size of local memberships differ among the unions . . . ." *Id.*, at 129–130.

See also United States Department of Labor, Bulletin No. 1239, Union Constitution Provisions: Election and Tenure of National and International Union Officers, at 15 (1958); National Industrial Conference Board, Handbook of Union Government, Structure and Procedures, Studies in Personnel Policy, No. 150, at 73 (1955).

[7] S. 1555, 86th Cong., 1st Sess., I Leg. Hist. 338.

[8] 105 Cong. Rec. 6475, II Leg. Hist. 1102.

of the same construction that is urged here in respect to § 101 (a)(3)(B), for it is quite clear that the author of this provision, Senator McClellan, did not intend to prohibit weighted voting. A few days later the Kuchel amendment, substituting another Bill of Rights provision, was adopted by a vote of 77 to 14.[9] This amendment eliminated some of the more stringent requirements of Senator McClellan's Bill of Rights, such as the limit on initiation fees, and dealt with voting procedures for approval of a dues increase by a local and an international union in more detail; in the case of a local, majority approval of the members was necessary, while in the case of an international, a "majority vote at a regular convention" was required. Under this language, which was said to be "taken almost verbatim from . . . the McClellan amendment," [10] it is very clear that no question of the permissibility of weighted voting could be raised. And no one expressed the thought that the McClellan proposal on voting was being altered in this or any other respect. S. 1555 passed the Senate with the Kuchel substitute as Title I.[11]

The changes in § 101 (a)(3)(B) in the House support the conclusion that this provision does not bar weighted voting. S. 1555, as passed by the Senate, became the focus of testimony before a Joint Subcommittee of the House Committee on Education and Labor.[12] The gist of the objections to § 101 (a)(3)(B) was that it failed explicitly to allow other methods of ensuring membership participation on proposals of an international or national union to increase dues, and it was too rigid in disallowing action

---

[9] 105 Cong. Rec. 6693–6694, 6727, II Leg. Hist. 1220–1221, 1239.

[10] 105 Cong. Rec. 6719, II Leg. Hist. 1232.

[11] S. 1555, 86th Cong., 1st Sess., I Leg. Hist. 516.

[12] Hearings before a Joint Subcommittee of the Committee on Education and Labor, House of Representatives, 86th Cong., 1st Sess., on H. R. 3540, H. R. 3302, H. R. 4473, and H. R. 4474 and Related Bills Regarding Labor-Management Reform Legislation.

by an executive board of the international or national union.[13] The Committee responded by expanding the permissible methods of raising dues. As reported out in the Elliott bill, § 101 (a)(3)(B) allowed an international to increase dues by majority vote of the members, by majority vote of the members of an executive board, effective only until the next convention, and "by majority vote of the delegates voting at a regular convention." [14] The Committee version was incorporated in identical language in the Landrum-Griffin bill, which prevailed on the floor of the House.[15] In respect to his bill, Representative Griffin observed generally that the "bill of rights in our substitute is essentially the bill of rights in the form passed by the [Senate]. It guarantees to union members, subject to reasonable rules and regulations, . . . that their dues and initiation fees will not be increased arbitrarily." [16] The House Joint Conference Committee Report confirmed the view that the Senate and House versions of Title I contain "similar provisions." [17] Senator Goldwater, a member of the Joint Committee that considered S. 1555 and Landrum-Griffin, stated in his textual analysis of both bills that the House version of § 101 (a)(3)(B) was technically preferable and that the differences were in respect to the expanded methods of approval under the House bill and the applicability of the House bill only to dues increases rather than all changes.[18] And Senator Kuchel, the author of the Senate version of the dues proposal, and a conferee, stated that the Landrum-Griffin bill "adopted substantially the same

[13] *Id.*, at 1517–1518.

[14] H. R. 8342, 86th Cong., 1st Sess., I Leg. Hist. 687, 697.

[15] H. R. 8400, 86th Cong., 1st Sess., 105 Cong. Rec. 15859–15860, II Leg. Hist. 1527, 1691–1692.

[16] 105 Cong. Rec. 15530, II Leg. Hist. 1566.

[17] H. R. Rep. No. 1147 on S. 1555, 86th Cong., 1st Sess., I Leg. Hist. 934–935.

[18] 105 Cong. Rec. 16487, II Leg. Hist. 1357.

bill of rights language" as he had earlier authored.[19] In light of the fact that the House changes were in the direction of affording unions more latitude for raising dues and the fact that no one, in the House or Senate, perceived that the House version would restrict voting at a convention to a head count of the delegates, we think it abundantly clear that § 101 (a)(3)(B) was intended to guarantee a member's "right to participate in deciding upon the rate of dues, initiation fees, and assessments," H. R. Rep. No. 741 on H. R. 8342, 86th Cong., 1st Sess., at 7, I Leg. Hist. 759, 765, but not to bar a well-known system of voting embodied in many union constitutions which well serves that end.

Other provisions of the LMRDA confirm this view. Section 101 (a)(3)(B) is a part of Title I, entitled the "Bill of Rights of Members of Labor Organizations." This Title guarantees to every member of a labor organi-zation equal rights and privileges to vote, to attend meetings, and to participate in the deliberations and business of such meetings. Section 101 (a)(3)(B) forms a part of this framework by requiring participation by all members, either directly or through their elected representatives, on certain union matters thought to be of special importance. We find nothing to indicate that Congress thought this objective would be better fulfilled by allowing a delegate to cast one vote, regardless of the size of his constituency, than by permitting him to cast a vote equal to the number of members he represents. As a part of the Act's purpose of protecting and fostering participation by the rank and file in the affairs of the union, Title IV contains elaborate statutory safeguards for the election of union officers. But nothing in that title prohibits election of union officers by delegates voting at a convention in accordance with the number of members

---

[19] 105 Cong. Rec. 16760, II Leg. Hist. 1373.

182

they represent.[20]   Respondents do not demonstrate any differences between weighted voting for officers of the union and weighted voting on changes in financial exactions that would support the asserted difference in voting procedures applicable to each.   It is argued that delegates may not ascertain or follow the wishes of the members in respect to dues and assessments.   But few issues are more likely to arouse active opposition and general membership participation than a proposal to increase dues.   Further, this argument is too broad, for it questions the validity of a system of representative union government and has little to do with the manner in which the representative's vote is counted.   Section 101 (a)(3)(B), as well as Title IV, authorizes a representative system of government and does not require a town meeting for action by an international or national union.[21]   To that end Congress recognized the key role of elections in the process of union self-government and surrounded it with many safeguards to provide a fair election and to guarantee membership participation.

The pervading premise of both these titles is that there should be full and active participation by the rank and

---

[20] See United States Department of Labor, Technical Assistance Aid No. 5, Electing Union Officers (rev. Sept. 1962).

[21] The Senate Committee Report accompanying S. 1555 stated in this regard:

"Under the National Labor Relations Act and the Railway Labor Act, a labor organization has vast responsibility for economic welfare of the individual members whom it represents.   Union members have a vital interest, therefore, in the policies and conduct of union affairs. To the extent that union procedures are democratic they permit the individual to share in the formulation of union policy.   This is not to say that in order to have democratically responsive unions, it is necessary to have each union member make decisions on detail as in a New England town meeting.   What is required is the opportunity to influence policy and leadership by free and periodic elections." S. Rep. No. 187, 86th Cong., 1st Sess., at 6–7, I Leg. Hist. 397, 402–403.

file in the affairs of the union. We think our decision today that the vote of an elected delegate may reflect the size of his constituency is wholly consistent with that purpose.

Accordingly, the judgments below are reversed and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE and MR. JUSTICE GOLDBERG took no part in the consideration or decision of this case.