**Peter TURNER, Plaintiff,**

v.

**Paul DEMPSTER and Sailors' Union of the Pacific, Defendant.**

**No. C–82–1117 RPA.**

United States District Court, N.D. California.

Aug. 18, 1983.

Robert Gibbs, Seattle, Wash., Dan Siegel, Oakland, Cal., Paul Alan Levy, Public Citizen Litigation Group, Washington, D.C., for plaintiff.

John Henning, Jr., San Francisco, Cal., for defendant.

## OPINION AND ORDER

AGUILAR, District Judge.

The Sailors' Union of the Pacific (SUP) is a labor organization that represents unlicensed seagoing personnel aboard vessels of shipping companies belonging to Pacific Maritime Association and other independent operators. SUP contracts to supply qualified seamen to meet the manning requirements of the operators' vessels. The seamen are dispatched to various vessels based upon seniority and a rating priority determined by length of service and possession of the required Coast Guard rating certificates prescribed by various regulations of the Department of Transportation.

Pursuant to the SUP constitution, there are three classifications of union members. Prior to the 1981 amendments, which are the subject of this lawsuit, the union constitution restricted "Class A" or "full book" membership to individuals who had served six qualifying years of employment, actually working on the deck of a ship at sea. Because employment often lasts for only months at a time, it frequently takes longer than six calendar years to satisfy the six year requirement. Only full book members are permitted to run for union office and vote on all union related matters.

"Permit members" are individuals who have paid dues for three years or more, but still have not satisfied the six year "on deck" work experience requirement necessary to attain full book member status. Permit members may vote in elections and hold office on only a limited basis.[1]

"Probationary members" are individuals who have paid an initiation fee but have paid dues for less than twelve months. Upon completion of probationary status and taking of the union's oath of obligation, a worker is admitted to full membership. However, it is not until he has paid dues for another two years and otherwise complied with the union's rules so as to keep in good standing, that he gains the political rights accorded to permit members.

In 1979, the U.S. Department of Labor notified defendant Paul Dempster, President and Secretary Treasurer of SUP, that the Department considered unreasonable and unlawful the union's six year requirement for full book status. In view of the Department's authority to go to Court to have unions elections set aside, *see* 29

---

1. For example, permit members are precluded from voting on such matters as disciplinary recommendations of a trial committee, restoration of membership, filling vacancies in office, and assessments. Further, permit members are not allowed to vote on constitutional amendments such as the one in dispute in the instant case. Additionally, only full book members are eligible to be members of such union bodies as the negotiating committees and the trial committees, and to vote on contracts, strikes and other matters of import.

U.S.C. §§ 481 *et seq.*, SUP and the Department attempted to reach a compromise resolution of the dispute.

Ultimately, Dempster decided to propose a constitutional amendment that would reduce from six years service to three year membership the time required to achieve full book status. Dempster decided to propose this amendment to the membership even though the Department of Labor sent him a letter officially objecting to the three year requirement. The letter expressed the Department's opinion that the three year restriction on the right of permit and probationary members to vote is "clearly unreasonable." At the same time, Dempster proposed another amendment calling for an increase in the quarterly dues from $30 to $50. The amendment regarding the requirements for full book status was published in *West Coast Sailor,* the union's newspaper. Dempster included statements supporting the amendment. These statements referred to the Department of Labor's disapproval of the six year requirement, but made no mention of the Department's opposition to the proposed three year requirement.

The election was conducted by mail over a two month period from April 15 to June 15, 1981. Only full book members, defined at that time as persons with six years actual sea time, were allowed to vote in the referendum.

Plaintiff, Peter Turner has been a dues paying member of SUP for 14 years. Nevertheless, he has been unable to attain full book status because he has not satisfied the six year actual sea time requirement. Accordingly, Turner was not allowed to vote in the 1981 referendum on the proposed constitutional amendment to change the requirement for attaining full book status.

Turner strongly opposed both the six year requirement and the proposed three year requirement for full book status. In order to sway the membership of the union to his position, Turner sought to notify the membership of the Department of Labor's opposition to the proposed three year require-

ment. Turner believed that a mailing was the only practical way to reach the members of the union.

On April 6, 1981, Turner wrote to Dempster asking to use the union membership list to do a mailing to the union membership. Turner stated that he intended to do the mailing at his own expense. Dempster responded to Turner by letter on April 14, 1981, rejecting Turner's request. Dempster's letter stated in part:

> After due consideration, your request to mail propaganda is denied. The ballot will show the proposed changes and the explanation of the reasons for the changes. No more is needed. Furthermore your request comes too late.

After receiving Dempster's letter, Turner sent each union office a copy of the statement he had hoped to distribute by mail. Turner asked that the statement be read to members present at the next union meetings. This was done only at the branch meetings in Seattle, Washington and Wilmington, Delaware. A total of 197 members were present at those two meetings. Thus, out of an electorate of 1,928, only about ten percent of the potential voters were exposed to Turner's views.

The members of SUP ratified both of the proposed constitutional amendments: the requirement for full book status was reduced from six years to three years and quarterly dues were increased from $30 to $50. Dissatisfied with the process and the result of the referendum, Turner filed this action seeking to have the election voided.

Turner seeks to have the referendum overturned on two grounds. First, Turner asserts that because the six year voter eligibility rule is unreasonable within the meaning of § 101(a)(1) of the LMRDA, 29 U.S.C. § 411, any referendum conducted pursuant to this rule is necessarily void. Second, Turner alleges that the referendum must be set aside because the union's refusal to give Turner the membership list unlawfully prevented Turner from expressing his opposition to the proposed amendments.

In addition, Turner asks the Court to rule that the modified (three year) voter eligibil-

ity requirement is unreasonable under the LMRDA. Based on this ruling, Turner seeks a ruling that the three year voter eligibility requirement is therefore void and unenforceable. Turner also requests that the Court find that the union breached its fiduciary duty under § 501 by expending union funds to publish materials supporting the proposed amendments. Finally, Turner seeks a finding that the union violated §§ 101(a)(1) and (2), 411(a), and 431(c), by refusing to give Turner access to legal memoranda regarding the proposed amendments. Turner has moved for summary judgment on all of the above-stated grounds.

Defendants have filed a cross-motion for summary judgment. Defendants claim that this Court lacks subject matter jurisdiction to determine the reasonableness of the union's voter eligibility requirements and that therefore the Court is precluded from ruling on the validity of the challenged referendum. Further, defendants contend that the LMRDA does not entitle plaintiff to have his opposition materials distributed in non-candidate elections. Finally, defendants contend that plaintiff has failed to satisfy the procedural requirements of 29 U.S.C. § 501, and is therefore barred from filing a lawsuit pursuant to that section.

## DISCUSSION

a. *Court's subject matter jurisdiction over plaintiff's challenge to validity of voter eligibility rules.*

Whether this Court has jurisdiction over plaintiff's challenge to the union's voter eligibility rules depends on whether plaintiff's complaint states a cause of action under Title I or Title IV of the LMRDA. Considerable tension exists between the two Titles, and the parties disagree about the issue of which Title plaintiff is proceeding under.

In general terms, Title I is designed to guarantee that union elections are free and fair. *Kupau v. Yamamoto,* 622 F.2d 449 (9th Cir.1980). Title I includes safeguards for the equal voting rights of members (§ 411(a)(1)),[2] as well as members' freedom of speech and assembly (§ 411(a)(2)).[3] Title IV, on the other hand, "sets up a statutory scheme governing the election of union officers, fixing the terms during which they hold office, requiring that elections be by secret ballot, regulating the handling of campaign literature, requiring a reasonable opportunity for nomination of candidates, authorizing union to fix 'reasonable qualifications uniformly imposed' for candidates, and attempting to guarantee fair union elections in which all the members are allowed to participate." *Calhoon v. Harvey,* 379 U.S. 134, 140, 85 S.Ct. 292, 296, 13 L.Ed.2d 190 (1964). The Ninth Circuit explained the substantive differences between Title I and Title IV as follows: "Title I, denominated a Bill of Rights, guarantees, in 29 U.S.C. § 411(a)(1), 'equal rights and privileges' to nominate and vote for candidates. Title IV, 29 U.S.C. §§ 481 *et seq.,* regulates the conduct of union elections in some detail." *Kupau,* 622 F.2d at 453.

Aside from these substantive differences, there is a considerable disparity in the en-

---

**2.** The full text of 29 U.S.C. § 411(a)(1) reads as follows: "*Equal rights.*—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and by-laws."

**3.** The full text of 29 U.S.C. § 411(a)(2) reads as follows: "*Freedom of speech and assembly.* —Every member of an labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates for election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."

forcement mechanisms for the two Titles. Title I grants aggrieved union members direct access to the federal courts. 29 U.S.C. § 412. Title IV, conversely, provides that an aggrieved union member must complain to the Secretary of Labor. 29 U.S.C. § 482. If the Secretary finds probable cause that Title IV has been violated, the Secretary may then file suit in the appropriate federal district court.

■■■ Before reaching any of the substantive issues raised in the cross motions for summary judgment, the Court must determine whether plaintiff's complaint relating to the voting requirement states a claim under Title I or Title IV. The Supreme Court has directed that "[a]n analysis and understanding of the complaint are . . . essential to a determination of this issue." *Calhoon,* 379 U.S. at 138, 85 S.Ct. at 295.

Through this lawsuit, plaintiff seeks to overturn the results of a referendum. Plaintiff argues that Title IV only applies to elections for union officers. Thus, according to plaintiff, Title IV does not grant the Secretary of Labor any authority to bring a legal action challenging the manner in which a union conducts a referendum. Under plaintiff's analysis, given that the Secretary of Labor is not empowered by Title IV to protect a union member's right to vote in a referendum, there is no protection for this right unless the union member can bring his own action in the federal courts under Title I.

Plaintiff is correct in his assertion that Title IV makes no mention whatsoever of referendums. Rather, the language of the section is strictly limited to detailed regulations concerning the election of union officers. Extensive research produces no cases that hold that Title IV has any bearing on or application to union referendums. Furthermore, close analysis of the enforcement provision for Title IV, 29 U.S.C. § 482, reveals that the Secretary of Labor is only empowered to ask a court to void an election of officers. The language of § 482 suggests that Congress did not contemplate that the Secretary would raise challenges to referendums.

Given that the overall purpose of the Landrum-Griffin Act is to insure union democracy,[4] if Title IV does not provide any protection for the voting rights of union members in referendums, then some other section of the Act must supply the protection that Title IV fails to provide. The only section that can be reasonably construed to apply to the referendums is Title I, 29 U.S.C. § 411(a)(1), which grants all members of labor organizations "equal rights and privileges . . . to vote in elections and referendums." This, in fact, is the only section in the LMRDA where there is specific reference to referendums. The Court finds, therefore, that § 411(a)(1) is the section that protects union members' right to participate in referendums.[5]

In order to state a cause of action under Title I, a plaintiff must set forth a claim of discrimination. *Kupau,* 622 F.2d at 453. Title I only protects members' equal rights in participating in certain union activities

---

**4.** See *Finnegan v. Leu,* 456 U.S. 431, 436, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982) (". . . the Act's primary objective of ensuring that unions would be democratically governed and responsive to the will of their membership."; *Aguirre v. Automotive Teamsters,* 633 F.2d 168, 172 (9th Cir.1980) ("renewed concern over claims of undemocratic union organizational practices prompted Congress to pass LMRDA . . ."). See also, Note, Titles I and IV of the LMRDA: A Resolution of the Conflict of Remedies, 42 U.Chi.L.R. 166 (1974).

**5.** The Court notes that a number of federal courts, including the Ninth Circuit, have applied Title I to cases involving referendums. See *Aguirre v. Automotive Teamsters,* 633 F.2d 168, 173 (9th Cir.1980); *Trail v. International Brotherhood of Teamsters,* 542 F.2d 961 (6th Cir.1976); *Blanchard v. Johnson,* 532 F.2d 1074 (6th Cir.1976); *Pawlak v. Greenawalt,* 464 F.Supp. 1265 (M.D.Pa.1979).

The matter of dues increases is addressed in 29 U.S.C. § 411(a)(3). That section grants union members' voting rights with respect to dues increases. In *Denov v. Chicago Federation of Musicians, Local 10–208,* 703 F.2d 1034 (7th Cir.1983), the Seventh Circuit held that the equal rights provisions of § 411(a)(3) are the same as those contained in § 411(a)(1). In this sense, the fact that plaintiff challenges a dues increase may establish an additional grounds for jurisdiction.

including voting. *Id.; Calhoon,* 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190. "In the absence of a claim of discrimination by the union against the union member, a federal district court lacks jurisdiction to award relief for an alleged violation of § 411(a)(1)." *Kupau,* 622 F.2d at 453. Plaintiff's complaint herein does contain the requisite discrimination charge. Plaintiff alleges that the union's voter eligibility rules make an unreasonable distinction between members with more than six years actual sea time and members who have served less than six years actual sea time. The allegations respecting the difference in the voting rights accorded to these two groups constitute allegations of discrimination sufficient to make plaintiff's claim one properly cognizable under § 411(a)(1).

Section 412 grants the right to bring an action in federal district court to any person whose rights under Title I have been violated.[6] Because the Court finds that plaintiff's complaint regarding voter eligibility requirements for the 1981 referendum is properly a claim under Title I, the Court concludes that it has jurisdiction over plaintiff's claims regarding voter eligibility rules.

b. *Substantive merits of plaintiff's challenge to the six year actual sea time requirement.*

Having determined that the Court has jurisdiction over plaintiff's claims, the Court must now reach the substantive merits of plaintiff's and defendants' claims. ▬ The question is whether the union's division of voting rights violates the

equal rights provision contained in Title I. Plaintiff first contends that the very fact that the union has parcelled out the right to vote in unequal allotments violates the equal rights provision.

A review of prevailing authority makes quite clear that plaintiff's argument is without merit. One of Congress' primary goals in enacting the LMRDA was to keep the Courts out of internal union affairs. *Calhoon,* 379 U.S. at 140, 85 S.Ct. at 296 ("general Congressional policy [is] to allow unions great latitude in resolving their own internal controversies.") Courts have hued close to Congressional purpose by refusing to get involved in questions about the division of voting rights within unions. *Denov v. Chicago Federation of Musicians, Local 10–208,* 703 F.2d 1034 (7th Cir.1983) (court found that Title I does not require one-member, one-vote system of representation; a system of proportional representation is permissible as long as some meaningful representation is achieved); *American Federation of Musicians v. Wittstein,* 379 U.S. 171, 85 S.Ct. 300, 13 L.Ed.2d 214 (1964) (Supreme Court held that system of weighted voting does not violate Title I). *See also Gordon v. Laborers International Union,* 490 F.2d 133 (10th Cir.1973). These courts have limited the review of a unions' division of the right to vote to an examination of whether the division is unreasonable or arbitrary or capricious. Barring such a finding, the courts have declined to rule on the wisdom of rules established by various unions. *See, Goldberg v. Marine Cooks and Stewards Union,* 204 F.Supp. 844, 845 (N.D. Cal.1962) ("it is not for this tribunal to

---

**6.** Defendants argue that post-election remedies, such as those sought by plaintiff, are only available under Title IV (29 U.S.C. §§ 481 *et seq.*). The Ninth Circuit in its decision in *Kupau v. Yamamoto,* 622 F.2d 449 (9th Cir.1980), directly controverted the defendants' argument. The Court of Appeals said that "it is difficult to reconcile a total post-election preemption by Title IV with the legislative history which, as noted above, reveals that Title I was added to the Act [after Title IV] to enlarge the rights of union members. In light of our holding that the mere existence of Title IV violations should not preclude relief under Title I, it would make little sense to permit pre-election challenges

under Title I but prohibit all post-election relief.... We thus conclude that the fact that balloting has already taken place does not bar the invocation of the district court's jurisdiction under Title I in that narrow class of cases in which the member can establish discrimination as required by the decision in *Calhoon v. Harvey.*" *Id.* 622 F.2d at 455–56.

In view of the language of the Ninth Circuit's opinion, this Court must conclude that the Court has jurisdiction to consider post-election claims under Title I. Thus, if plaintiff has a valid claim under Title I, this Court will entertain the claim even though plaintiff seeks post-election relief.

impose its concept of a proper period [for gaining voting right] upon the union."). Consequently, the Court concludes that the fact that the Sailors' Union of the Pacific divided the right to vote among its members, does not in itself violate the equal rights provision of Title I.

Plaintiff's next, and far more substantial ground for challenging the 1981 referendum is that SUP's particular division of the right to vote violates the equal rights provision of Title I. Specifically, plaintiff alleges that the six year requirement is unreasonable.

 As discussed above, federal courts will review the reasonableness of union rules relating to the right to vote. The Court must, however, move very carefully in this area, as it is the sound policy of the federal courts to keep involvement in internal union affairs to the absolute minimum. *Calhoon*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190.

Further, even to the limited extent that the Court is willing to examine the union's internal affairs, the Court gives great deference to the union. *Id.* In determining whether the union's voter rules are "reasonable" under Title I, the Court must take into account the interests of the union itself, the special demands of the job, and the manner in which the demands of the job effect the union's ability to organize and represent the workers. *See Goldberg*, 204 F.Supp. at 845.

In the instant case, the Sailors' Union of the Pacific has undertaken to organize a group of workers that is particularly difficult to organize—unlicensed seagoing personnel. This is a highly unstable job, involving many individuals who move in and out of the workforce. The problems of union organization and representation are compounded by the fact that the work is completely uncentralized and that workers are sometimes out to sea and virtually unreachable for months at a time. All of these factors weigh heavily in favor of the union requiring a longer than usual service time before granting members the right to vote in all union matters.

Nevertheless, the union cannot use these facts to shield its voter eligibility rules from all judicial scrutiny. Thus, even though the Court should and does give deference to the union's choice about the appropriate length of time a member should serve before receiving full voting rights, the Court is also aware of its responsibility under Title I to ensure that the voting requirements established by SUP are not unreasonable or otherwise arbitrary and capricious.

Unfortunately, the Court cannot rely on precedent as there have been very few cases of the sort presented by these parties.

Defendants rely heavily on the decision in *Goldberg v. Marine Cooks and Stewards Union*, 204 F.Supp. 844 (N.D.Cal.1961). In *Goldberg*, the court approved a rule that required individuals serve three years of sea time before receiving the right to vote. *Id.* The Court recognized that such a long service requirement "precludes many individuals from becoming eligible to vote" but determined that "it is not for the Court to upset such membership requirements unless it be deemed arbitrary and capricious or otherwise unreasonable." *Id.* at 845.[7]

---

7. There is some ambiguity as to the status of the individuals involved in the *Goldberg* case. When the Court posed the question it referred to the people who were being denied the right to vote as "individuals who have certain seniority rights but are not deemed to be members of defendant union." Id. 204 F.Supp. 844. In another portion of the opinion, the Court refers to individuals that do not have the right to vote as "full-book members," suggesting that those who were denied the right to vote may be members of the union but not full-book members.

This distinction, though it may seem minor, may be very important with respect to the applicability of *Goldberg* to the instant case. If the individuals who could not vote were not union members, then the issue in *Goldberg* was the requirement for becoming a member of the union, a separate and distinct issue from that presented in the instant case. If, on the other hand, the individuals who were denied the right to vote were union members, but not full-book members, then the *Goldberg* case was identical to the instant action.

As discussed earlier, Congress' intent in adopting the Landrum-Griffin Act was to create a statutory basis for ensuring the existence of union democracy.[8] Union democracy of the sort envisioned by Congress encompassed two complimentary concepts. On the one hand, union democracy means preventing union leaders from dictating union affairs without regard for the membership. The Supreme Court has said that the purpose of Title I was to guarantee "the independence and fair operation of the union as the representative of its membership." *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973).

The Landrum-Griffin Act was also designed to protect the voting rights of individual union members. As the Supreme Court said in *American Federation of Musicians v. Wittstein,* 379 U.S. 171, 85 S.Ct. 300, 13 L.Ed.2d 214 (1964), the "pervading purpose of [the Act] is that there should be full and active participation by the rank and file in the affairs of the union." *Id.* at 182–83, 85 S.Ct. at 307.

Under the six year sea time requirement, fully one-third of the members of the Sailors' Union of the Pacific were not full-book members. Accordingly, one-third of the union was unable to participate in referendums on such crucial matters as constitutional amendments. Precluding such a large portion of the membership from voting on vital issues for such a long time strikes this Court as being diametrically opposed to the Congressional intent voiced in Title I of the Landrum-Griffin Act.

Thus, in view of the goals of the Act, the Court concludes that the six year actual sea time requirement is not a reasonable regulation under 29 U.S.C. § 411(a)(1). In reaching this conclusion, the Court is mindful of the previously discussed judicial deference to the union's choices, and of the justifications for the voter eligibility rule. However, even with these weighty considerations on one side of the equation, the Court believes that it must find the six year sea time requirement violates Title I of the LMRDA because the exclusion of such a large percentage of the membership, including some individuals like plaintiff who have served in the union for many years, is repugnant to Congressional intent as expressed in § 411(a)(1) of the Act.[9]

Accordingly, the Court has no choice but to void the referendum conducted between April and June 1981, because the referendum was conducted pursuant to voter eligibility rules that unreasonably impinged on union members' right to vote in violation of 29 U.S.C. § 411(a)(1).[10]

The Court is well aware of the difficulties this ruling may occasion. Nevertheless, the Court believes that the result contained herein is dictated by the LMRDA. The Court also refrains from commenting on the reasonableness of the three year actual sea time requirement proposed in the 1981 referendum. That question is not properly before the Court at this time. However, the Court does suggest that the union pay close attention to the Department of Labor's opinion on the reasonableness of any proposed voter eligibility rule.

For the reasons stated above, and for good cause appearing, the Court grants plaintiff's motion for summary judgment and voids the 1981 referendum on constitutional amendments.

IT IS SO ORDERED.

8. See footnote 5, *supra.*

9. The fact that the Department of Labor found the six year requirement unreasonable lends further credence to the Court's decision on this question.

10. Because the Court has determined to void the 1981 referendum on the grounds stated above, the Court believes that it is neither necessary nor proper for the Court to rule on the other grounds advanced by plaintiff. Thus, the Court refrains from making any comment on the substantive merits of plaintiff's claims.