LIPEZ, Circuit Judge,
concurring.
Recognizing the deferential standard that we must apply, I agree with Judge Lynch that the Secretary of Labor’s characterization of the NERCC as an “intermediate” union body was not arbitrary and capricious. Nevertheless, drawing on scholarship about union organization at the time of the LMRDA’s enactment and the LMRDA’s legislative history, I write separately to register my concern that the Secretary’s approach may be a departure from the more ideal form of union democracy that Congress sought to protect through its enactment of the LMRDA.
The SSR stated that an organization “at the middle of a union’s structure” becomes *64 a local union only if it “take[s] over so many of the functions and purposes of the local labor organizations such that the entity should itself also be treated as a local organization for purposes of the LMRDA.” SSR, at 3. The Secretary acknowledges in her reply brief that this standard sets a high threshold for concluding that an intermediate is, in reality, a local, but claims that it is “strongly supported” by the LMRDA’s legislative history. The SSR explained that when the LMRDA was passed, intermediate bodies engaged in a wide range of representational activities, including collective bargaining and the discipline of union members. Therefore, it concluded that Congress associated the extensive labor relations functions of the NERCC with intermediate as well as local bodies when it adopted Title IV’s election provisions.
I agree with Judge Lynch that it was reasonable for the Secretary to conclude that when Congress adopted the LMRDA, intermediate bodies were already performing representational activities such as the coordination and negotiation of collective bargaining agreements. However, the legislative history of the LMRDA and contemporary scholarship on union government suggest that Congress did not associate intermediate bodies with a full range of functions historically performed by local unions. Rather, there is reason to believe that Congress understood that local unions would continue to exercise primary or exclusive authority over most traditionally local functions, particularly those that directly affected ordinary union members. Thus, by requiring local unions to select local officers by direct membership election, Congress protected the rights of rank-and-file union members to exercise control over the decisions and activities that affected their daily working lives. Consequently, the Secretary’s willingness to allow intermediate bodies to assume an ever-increasing number of local union functions without subjecting them to the LMRDA’s direct election requirements represents a threat to union democracy and may eventually stray too far from Congress’s intent in adopting Title IV of the LMRDA.
I.
In the United States, the local was long considered “the basic building block of the union.”[14] Leonard R. Sayles & George Strauss, The Local Union 2 (1953) (rev.ed.1967); see also Derek C. Bok & John T. Dunlop, Labor and the American Community 51-52 (1970) (explaining that strong local unions are a unique feature of American unionism not experienced in Europe or Australia). Its daily functions included holding meetings, collecting and spending dues, bargaining with employers, handling grievances, responding to employer concerns, sending delegates to district councils and state and city central labor bodies, and doing “one hundred other things.” Jack Barbash, Labor’s Grass Roots 3-4 (1961).
*65 At the same time, “the reach of a local’s collective bargaining functions invariably extend[ed] to collaboration with other locals of its international union and with locals of other internationals,” usually through intermediate bodies such as district councils, joint boards, and regional, district, or industry councils. Id. at 2. Intermediate bodies were representative bodies made up of delegates from subordinate locals that shared a similar territorial location or employment industry or trade. Id. at 14, 134. Their purpose was “to join the local unions in larger governmental units for cooperative action and to regulate and administer their joint activities.” William M. Leiserson, American Trade Union Democracy 316 (1959). “The intermediate body [was] utilized most commonly by a group of locals to achieve a common objective in collective bargaining.” Barbash, American Unions, at 55. District or area councils, for example, were typically formed “to coordinate bargaining throughout a local or regional product market, or simply to achieve an organization of sufficient size to support a full-time staff.” Bok & Dunlop, Labor and the American Community, at 150. Some intermediate bodies were little more than advisory bodies. Leiserson, American Trade Union Democracy, at 315. Others, like the Carpenters District Councils, “had a primary role in the negotiation of the [collective bargaining] agreement.” Bar-bash, Labor’s Grass Roots, at 138. By the 1960s, although the view that “local bargaining predominates ... represented] the consensus, ... the drift — it would be wrong to characterize it as a trend or tendency — [was] probably away from exclusive local control of the negotiation of the agreement.” Id. at 145 (citation and internal quotation marks omitted).
Contract negotiation was only one aspect of the collective bargaining process, however, and other representational functions remained distinctly local.[15] In particular, contract enforcement, described as “[t]he enforcement of the agreement through a grievance procedure or through informal adjustment procedures [was] overwhelmingly in the precinct of the local union.”[16] Id. at 144; see also Bok & Dunlop, Labor and the American Community, at 51 (stating that even in sectors where “control over collective bargaining has gravitated to the national or regional level ... local unions still retain considerable influence over the administration of the contract”); Donald R. Anderson, Note, Landrum-Griffin and the Trusteeship Imbroglio, 71 Yale L.J. 1460, 1464 (1962) (noting that despite increased centralization within- some unions, “the grievance machinery necessarily remains in local hands, primarily run by on-the-job stewards”). Similarly, union constitutions generally vested in local unions the power to authorize strikes, either independently or subject to international approval.[17] While *66 wage issues were sometimes settled at the level of the intermediate or international organization, “the issue of work rules remain[ed] for local negotiation.” Id. It appears that local unions also retained control over the discipline of union members; as one scholar noted, “analysis of the disciplinary process indicates that prevailingly (1) the power to discipline rests with the local union, and (2) that within the local the power rests with the local union membership.” Barbash, Labor’s Grass Roots, at 29. While some intermediate bodies participated in the disciplinary process, they did so by hearing appeals from the decision of the local executive board or trial committee. Id. at 29. In short, “[d]espite ... continuing concentration of power, the local union remain[ed] a basic structural unit of the labor movement, performing the day-to-day functions that most closely affect[ed] the individual workers.” Anderson, Trusteeship Imbroglio, at 1463-64.
On the other hand, in some unions, the intermediate body began to “acquire[] a life of its own,” occasionally to the extent that it assumed many of the functions traditionally associated with local unions. See Herbert J. Lahne, The Intermediate Union Body in Collective Bargaining, 6 Indus. & Lab. Rel. Rev. 163, 164 (1953). Scholars were critical of this trend because of the effect that it had on local unions and consequently on union democracy. See, e.g., Barbash, Labor’s Grass Roots, at 234 (noting that “[s]ome intermediate bodies, particularly the joint-board type or joint-council type in the larger city, have gone too far in reducing the local union to nothing more than a union meeting” and calling upon such bodies to “appropriate only the functions which are intrinsic to [them]”); Lahne, The Intermediate Union Body in Collective Bargaining, at 164 (“When the role of the individual local in collective bargaining and grievance handling is reduced to participation in the deliberations of a delegate body, an important source of local union vitality is surrendered to a species of outsider.”). This criticism reflected a concern that the appropriation by intermediate bodies of most or all of the representational activities traditionally performed by local unions denied an important measure of participation in union affairs to rank-and-file members, who could participate in intermediate bodies only indirectly through representatives of their locals.
II.
After considering the legislative history of the LMRDA against this historical backdrop of union organization, I believe that there is reason to question whether Congress intended to endorse an expansive role for non-membership-based intermediate bodies within a labor union when it enacted the LMRDA, a statute that was intended to restore and strengthen union democracy, largely through the election provisions of Title IV. Indeed, my review of the LMRDA’s legislative history suggests that Congress envisioned a more circumscribed role for intermediate bodies than the SSR describes. Senator Barry Goldwater vigorously lobbied to include intermediate bodies in the LMRDA’s definition of labor organizations so that they would not be exempt from the statute’s prohibitions and sanctions. The original Senate Committee bill had defined a labor organization as one in which “employees *67 participate and which exists for the purpose, in whole or in part, of collective bargaining.” Senator Goldwater argued that this definition afforded a dangerous loophole for intermediate bodies, some of which had become infamous for their corruption and abuse of power:
Conferences, such as the Western Conference of Teamsters, formerly headed by the notorious Frank Brewster, joint boards, and councils are not composed of employees and do not engage in collective bargaining. The committee bill’s definition thus does not include any conference, joint board, joint council, or other association or aggregation of representatives of labor unions, thus freeing them from the sanctions, prohibitions, and other requirements of the bill.
86 Cong. Rec. S. 5847 (daily ed. Apr. 23, 1959) (statement of Sen. Goldwater), in National Labor Relations Board, 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, 1121 (1959) (emphasis added). Senator Goldwater proposed to include in the definition of “labor organizations” the phrase: “and any conference, joint board, joint council, or other association or aggregation of labor organizations other than a State federation or central labor council or an association formed to carry on educational activity or to represent its members before any judicial, administrative, or legislative body.” Id. Senator Goldwater’s proposed amendment was adopted on the Senate floor.[18] Thus, the author of the amendment that brought intermediate bodies under the purview of the LMRDA viewed them as organizations that 1) were composed of representatives of local unions rather than employees, and 2) did not engage in collective bargaining activities.
Although the LMRDA does not define the terms “local labor organization” or “intermediate bodies,” the final act clearly distinguished between the two kinds of union bodies in its definition of “labor organizations.” For the purposes of the act, a labor organization is one that is
engaged in an industry affecting commerce and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization, other than a State or local central body.
29 U.S.C. § 402(i). Notably, intermediate bodies are not included among those organizations composed of employees or dealing with employers “concerning grievances, labor disputes, wages, rates of pay, *68 hours, or other terras or conditions of employment.” Rather, they are described in terms of their formal label (“conference, general committee, joint or system board, or joint council”), their structural position in the union hierarchy (“subordinate to a national or international labor organization”), and their general function (“engaged in an industry affecting commerce”). See Julius Rezler, The Definitions of LMRDA, in Symposium on LMRDA 267 (1961) (noting that the LMRDA divided labor organizations into two groups: “first, organizations in which employees participate and which exist for the purpose of dealing with employers concerning the terms and conditions of employment; and second, the so-called intermediate bodies not necessarily composed of employees or dealing with employers, but subordinated to national or international unions”). Although this definition does not prevent intermediate bodies from engaging in collective bargaining activities, neither does it include intermediate bodies in its description of labor organizations that interact directly with union members and participate in such activities as settling grievances and negotiating with employers over issues concerning the terms or conditions of employment.
As the SSR noted, the Senate Committee Report to the LMRDA stated that intermediate bodies can “exercise responsible governing power,” without elaborating upon the nature or scope of that power. See S.Rep. No. 86-187, at 20 (1959), reprinted in 1959 U.S.C.C.A.N. 2318, 2336. However, the report also included a broader statement of Congress’s objectives in enacting the LMRDA, and in particular Title IV’s election provisions:
It needs no argument to demonstrate the importance of free and democratic union elections. Under the National Labor Relations and Railway Labor Acts the union which is the bargaining representative has power, in conjunction with the employer, to fix a man’s wages, hours, and conditions of employment. The individual employee may not lawfully negotiate with his employer. He is bound by the union contract. In practice, the union also has a significant role in enforcing the grievance procedure where a man’s contract rights are enforced. The Government which gives unions this power has an obligation to insure that the officials who wield it are responsive to the desires of the men and women whom they represent. The best assurance which can be given is a legal guarantee of free and periodic elections.
S.Rep. No. 86-187, at 20 (1959), reprinted in 1959 U.S.C.C.A.N. 2318, 2336. This statement demonstrates that Congress sought to “protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government, and, through the election process, to keep the union leadership responsive to the membership.” Wirtz v. Hotel, Motel & Club Employees Union Local 6, 391 U.S. 492, 497, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968); see also Am. Fed. of Musicians v. Wittstein, 379 U.S. 171, 181, 85 S.Ct. 300, 13 L.Ed.2d 214 (1964) (“As a part of the [LMRDA’s] purpose of protecting and fostering participation by the rank and file in the affairs of the union, Title IV contains elaborate statutory safeguards for the election of union officers.”); Clyde W. Summers, Judicial Regulation of Union Elections, 70 Yale L.J. 1221, 1221 (1961) (The LMRDA “recognizes the key role of union elections,” which “are the main nerve centers of union democracy, for it is through the officers that the will of the members is translated into effective action.”). As Senator Robert Griffin, cosponsor of the Senate bill that ultimately became the LMRDA, later commented: *69 “Landrum-Griffin focused upon a basic precept — the principle that each individual member should be able to play a participatory role in the affairs of his union.” Robert P. Griffin, The Landrum-Griffin Act: Twelve Years of Experience in Protecting Employee Rights, 5 Ga. L.Rev. 622, 622 (1971).
The local union logically served as the organizational unit through which members could most effectively participate in union affairs. Since the LMRDA required the election of local officials “at least every three years by secret ballot membership referendum, union members [could] have direct control over their local leaders, assuming an honest count.” Herman Benson, The Fight for Union Democracy, in Seymour Martin Lipset, Unions in Transition: Entering the Second Century 326 (1986). Local unions “offered the maximum potential for direct membership control” because through those local organizations, “dues-payers c[ould] assess their leadership with reasonable accuracy, watching how grievances are processed [and] how local meetings are conducted,” and “express their dissatisfaction ... [with union policies] by defeating local incumbents and electing .oppositionists.” Id. Thus, in promoting union democracy through Title TV’s election provisions, the LMRDA relied on the existence of local unions which maintained direct ties to rank-and-file union members and exercised meaningful control over functions that directly affected those members’ working lives. Cf. Anderson, Trusteeship Imbroglio, at 1464 (“The worker’s power to affect overall union policy necessarily starts in the local union; it is at this level that the member actively participates in the life of the union.”); Barbash, Labor’s Grass Roots, at 240 (noting that “the superior democratic performance of the local union is due” in part to “the closeness of the union member physically and socially to the governmental process” and “the meaningfulness and concreteness of the issues which the local union deals with”). Considering the LMRDA’s “overriding objective of democratic union governance,” Sheet Metal Workers’ Int’l Ass’n v. Lynn, 488 U.S. 347, 353, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989) (citation and internal quotation marks omitted), it seems likely that the LMRDA required the direct election of local but not intermediate body officers precisely because the local was understood to exercise primary control over activities such as contract enforcement, member discipline, strike authorization, job referrals, and the collection of dues, that most directly affected the daily working lives of union members.[19]
In light of the historical context and congressional history of the LMRDA, I believe that there is some force to the plaintiffs’ claim that the Secretary’s decision not to recognize the NERCC as a local union is inconsistent with the LMRDA, considered as a whole. Although intermediate bodies engaged in representational activities at the time that the LMRDA was enacted, many important labor union functions were perceived as distinctly “local,” and the trend toward centralization was criticized for its effect on union democracy. Senator Goldwater’s view that intermediate bodies did not en *70 gage in collective bargaining, the LMRDA’s definition of labor organizations, and the Act’s underlying goal to encourage participation of ordinary members in union affairs and assure the responsiveness of their representatives further suggest that Congress understood intermediate bodies to possess limited powers.
As Judge Lynch ably explains, we must uphold the Secretary of Labor’s decision not to sue under the LMRDA unless it is “so irrational as to constitute the decision arbitrary and capricious.” Dunlop v. Ba-chowski, 421 U.S. 560, 573, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975). The Secretary’s approach and conclusion survive review under this highly deferential standard. Nevertheless, I believe it is incumbent upon the Secretary to remain vigilant that her enforcement actions are consistent with the principles of union democracy that Congress sought to vindicate when it required the direct election of local union officials in Title IV of the LMRDA.

. The local union typically consisted of a substructure of smaller units, which "in contrast to the local, usually lackfed] some attribute of self-contained government in that it [did] not have authority to tax, discipline, or enter into a formal agreement with management.” Barbash, American Unions: Structure, Government, and Politics 42 (1965). The NERCC’s subordinate locals appear to lack authority to enter into collective bargaining agreements, appoint trial committees, and preside over formal disciplinary procedures, suggesting, perhaps, that they are more akin to a sub-local unit than a local union. See SSR, at 4 (explaining that in determining whether a union is local or intermediate, the functions and purposes of its subordinate unions should be examined to determine whether they "exist for purposes traditionally associated with local labor unions”).

. Professor Jack Barbash defines collective bargaining as a process that involves "the negotiation of the agreement, the enforcement of the agreement including arbitration, and the strike as the fundamental sanction through which the union is able to bargain collectively.” Barbash, Labor’s Grass Roots, at 2.

. The railroad industry represented a notable exception to the rule of local control over contract enforcement; in that industry, the intermediate body exercised control over both "the negotiation of the contract and ... the adjustment of grievances under the contract.” Barbash, Labor's Grass Roots, at 138.

.In the mid-1950s, the National Industrial Conference Board reported that seventy-four percent of union constitutions gave local unions the power to authorize strikes. In fifty-three percent, the international held the final authority to approve strikes initially authorized by the local. Most of the remaining union constitutions either prohibited strikes or did not include provisions governing strike *66 authorization. Less than four percent of unions vested sole power to authorize local strikes in the international union, and apparently none vested such authority in intermediate bodies. Barbash, Labor’s Grass Roots, at 151 & n. 37 (citing National Industrial Conference Board, Handbook of Union Government and Structure 42 (1955)).

. Following the passage of the LMRDA, Senator Goldwater reiterated his earlier view of the importance of including “intermediate bodies” in the act’s definition of a labor organization:
Section 3(1) defines a labor organization to include “any conference, general committee, joint or system board, or joint council.”
Organizations or associations of this type were not defined as labor unions in the bill reported by the Senate Labor Committee to the Senate. In executive session, I offered an amendment to include them which was rejected. On the floor, I again offered this amendment, which was, in substantial part, approved.
Failure to include such an amendment would have meant that those so-called intermediate labor bodies would have been exempted from the bill’s many restrictions, requirements, and sanctions designed to achieve the minimum of necessary reform in labor unions.
Id. at 1843.

. The NERCC presently performs many of these traditionally local functions. For example, it negotiates collective bargaining agreements, which are submitted for ratification by the general union membership rather than by the locals. It controls the enforcement of contracts through the appointment and supervision of grievance stewards. In addition, the NERCC has exclusive authority over all organizers and business representatives in the New England region, appoints all disciplinary trial committees, levies a portion of union members' dues, and approves dues levied by the local unions.