Donald **DORNAN**, et al.,
Plaintiffs–Appellees,

v.

**SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION**, et al.,
Defendants–Appellants.

No. 88–1380.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 17, 1989.

Decided June 5, 1990.

As Amended on Denial of Rehearing
Aug. 21, 1990.

Darrell M. Amlin, Detroit, Mich., C. Douglas Lovett (argued), Cleveland, Ohio, for plaintiffs-appellees.

Donald W. Fisher (argued), Donald W. Fisher Co., L.P.A., Toledo, Ohio, for defendants-appellants.

Before KENNEDY and JONES, Circuit Judges, and SILER, Chief District Judge.[*]

NATHANIEL R. JONES, Circuit Judge.

Defendants, Local No. 7 of the Sheet Metal Workers' International Union (Local 7), *et al.*, appeal the district court's order which granted damages and injunctive relief to the plaintiffs, Donald Dornan, *et al.* For the reasons which follow, we affirm in part, reverse in part and remand to the district court.

### I.

On November 5, 1985, Edward Carlough, General President of the Sheet Metal Workers' International Association (International), merged four Michigan local unions into a single, newly chartered union, Local 7. Article 3, Section 2(g) of International's constitution gives the General President the authority to amalgamate or merge existing unions and to charter new local unions. Carlough set Local 7's operating budget at approximately $90,000.00 and assessed a dues rate of $30.00 per month (plus 2% of all hours worked each

month) for Local 7's members. Carlough stated that he chose this rate because it would generate enough revenue to cover Local 7's operating expenses. The dues rates in effect for the four defunct local unions ranged from $30.00 per month (plus $.15 per hour worked) to $60.00 per month. Both parties agree that these rates would not have generated enough revenue to cover Local 7's operating expenses and that Local 7's rate was higher than the rate that most Local 7 members paid to their old locals.

International's constitution does not specifically address who is authorized to determine the amount of dues to be assessed against a newly chartered local whose membership is derived from defunct locals. Article 10, Section 2(f) of International's constitution, however, provides that each local union must "establish and maintain a ... rate of dues sufficient to carry on the affairs of such Local Union on a sound financial basis.... The amount of said dues in no case shall be less than those prescribed in this Constitution." J.App. at 19 (Constitution and Ritual of Sheet Metal Workers' International Association at 48–49). In addition, Article 10, Section 2(g) of the constitution states that the minimum monthly dues for a member of a union of Local 7's size is approximately $33.00 per month. While the International assumed that Article 10, Section 2(f) gave Carlough the authority to establish a dues rate for Local 7, it did not believe that Article 10, Section 2(g) restricted the rate to the constitutional minimum rate. Rather, the International assumed that Carlough could assess any dues rate necessary to generate enough income to cover Local 7's operating expenses.

The plaintiffs are building trade members of Local 7. They have not alleged that Carlough lacked the authority to merge the four unions or to charter Local

---

[*] The Honorable Eugene E. Siler, Jr., Chief Judge for the Eastern District of Kentucky, sitting by designation.

7. However, in their original complaint, filed on March 27, 1986, the plaintiffs alleged that because Local 7's dues were higher than the rates the members previously paid, Carlough's action violated Section 101(a)(3)(A) of the Labor–Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 411(a)(3)(A)(1982). Section 101(a)(3)(A) provides, in relevant part, that "the rate of dues ... payable by members of any labor organization ... shall not be increased ... except ... in the case of a local labor organization ... by majority vote by secret ballot ... at a general or special membership meeting." Since Local 7 was a combination of "old" unions and since Carlough's dues rate had not been approved by a majority vote of Local 7's members, the plaintiffs alleged that Carlough's action constituted an unlawful dues increase in violation of the LMRDA.

In the parties' first appearance before the district court, the court found that "in form and in substance, a new local union was created" when Carlough merged the four locals into Local 7. J.App. at 50. 640 F.Supp. 418. The court determined that since Carlough had the power to charter new locals, he also had the power to establish a "start up" dues rate to initially fund Local 7. The court held, however, that section 101's policy favoring democratic rule of labor organizations required that Local 7's members have the opportunity to approve, alter or eliminate Carlough's proposed rate. Despite these findings, the court did not explicitly state whether Carlough's action constituted a "dues increase" within the meaning of section 101(a)(3)(A). Because the International informed the court that it had scheduled a special membership meeting for May 31, 1986 to allow Local 7's members to vote on Carlough's proposed dues rate, the district court dismissed plaintiffs' complaint. However, the court noted that plaintiffs retained the right to reinstate the complaint if the meeting (or the vote) did not occur.

On April 28, 1986, the International informed the members of Local 7 that while they would be allowed to discuss dues proposals at the special membership meeting, all dues proposals must generate sufficient revenue to enable Local 7 to cover its operating expenses. The International proposed three dues rates at the meeting, all of which would generate income of approximately $90,000.00. One of the plaintiffs, John Bastin, attempted to make a motion ("Bastin proposal") that the membership be allowed to vote on a flat rate of $50.00 per month. Because the chairperson of the meeting ruled that Bastin's proposed rate would not generate $90,000.00 in revenue, the membership was not allowed to vote for the Bastin proposal. Even though the chairperson's ruling prevented Bastin from making his proposal, Bastin did not fully appeal this ruling through the internal union procedures, nor did the plaintiffs challenge Carlough's determination that Local 7's operating budget should be $90,000.00. Rather, on June 9, 1986, nine days after the special meeting and two days before the scheduled membership vote, the plaintiffs moved the court for reinstatement of their complaint based on the chairperson's ruling.

On June 11, 1986, a majority of the members of Local 7 voted to accept a proposal which required that they pay $30.00 per month plus 2% of the zone's base rate. This rate was effective as of July 1, 1986. The district court granted the plaintiffs' motion to reinstate their complaint on June 20, 1986. Following the reinstatement of the complaint, the International notified Local 7's members that a second meeting would be held at which time they could vote whether to retain the rate which they adopted or whether to accept the Bastin proposal. The membership ultimately adopted the Bastin proposal and the International filed a motion to dismiss plaintiffs' amended complaint on the ground of mootness. On January 29, 1987, however, plaintiffs filed a motion for summary judgment as to liability and, for the first time, argued that the International was prohibited from

imposing *any* rate which was in excess of the minimum rate provided in International's constitution.

In ruling on the parties' motions, the district court determined that, under section 101, Local 7 had a right to commit "suicide ... [i]f they do it by a democratic vote" and that the International had no authority to prevent Local 7's members from approving a dues proposal which would not cover Local 7's operating expenses. J.App. at 285. In addition, while the court acknowledged that the four defunct locals had dues rates which were greater than International's constitutional minimum, the court nevertheless held that the only democratically determined dues rate at the time the unions merged was International's constitutional minimum. In a subsequent order, the court ruled that damages against Local 7 should be calculated based on the excess monthly dues collected over the constitutional minimum until the membership adopted a dues rate which was in excess of the constitutional minimum. The court also enjoined Local 7 from collecting any dues greater than International's constitutional minimum until another vote was held.

## II.

Local 7 claims that since the district court found that the local is "new" and has no existing dues rate, Carlough's action was not a dues increase within the meaning of section 101. The plaintiffs respond that Local 7 is not a "new" local but is a combination of old locals. Additionally, plaintiffs claim that even if Local 7 is a new local, any rate which Carlough established would be an "increase" since a newly chartered union would have an initial dues rate of zero.

## A.

■ In examining Local 7's claim that Carlough's action was not a dues increase, we must initially determine whether Local 7 is a new or old union. Upon reviewing the record in this case, we are unable to agree with the district court's conclusion that Local 7 was a "new" union. Rather, we conclude that Local 7 was the successor union to the five defunct locals. Given the paucity of law on successor unions, it is instructive to examine the law in the analogous area of successor employers in elucidating our conclusion. In *NLRB v. Burns Security Services*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), the Supreme Court discussed the labor law rights and obligations of "successor" employers. In that case, a defendant-employer, Burns, replaced an employer who had a contract with a factory and, in the process, hired a majority of its predecessor's employees when it assumed the contract. Although Burns knew that the employees were represented by a union which had a collective bargaining agreement (CBA) with the predecessor employer, Burns maintained that it was not required to recognize the union, to bargain with the union or to honor the CBA because it already had a CBA with another union. The Court held that because Burns did not participate in the negotiations for the predecessor's CBA, it was not bound by the substantive provisions of the agreement. However, the Court held that "where the bargaining unit remains unchanged and a majority of the employees hired by the new employer are represented by a ... bargaining agent," the new employer is required to bargain with the union. *Id.* at 281, 92 S.Ct. at 1579. *See also John Wiley & Sons v. Livingston*, 376 U.S. 543, 548, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964) ("We hold that the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances ... the successor employer may be required to arbitrate with the union under the agreement.")

In contrast, the successor employer in *Howard Johnson Co. v. Hotel Employees*,

417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), hired less than a majority of its predecessor's employees. Unlike the union in *Burns*, the Court observed that this union was not protecting the rights of the rehired workers but, instead, was attempting to protect the rights of the employees who were *not* hired by forcing Howard Johnson to hire them. The Court emphasized that, under *Burns*, Howard Johnson was not required to hire *any* of its predecessor's employees and reiterated that one of the purposes of the "successor" doctrine is to protect the rights of employees who are hired by the employers and to avoid "sudden changes in the terms and conditions of their employment." *Id.* at 264, 94 S.Ct. at 2244. Thus, Howard Johnson was not required to arbitrate with the union because there was no "substantial continuity of identity in the work force" across the change in ownership and Howard Johnson did not agree to assume the terms of the CBA. *Id.*

In *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987), the Supreme Court again examined the successor employer doctrine. The Court reaffirmed the principle that a "new employer has an obligation to bargain with ... [a] union so long as the new employer is in fact a successor of the old employer and the majority of its employees were employed by its predecessor." *Id.* at 41, 107 S.Ct. at 2235. The Court stated that "determining whether a new company [is] indeed the successor to the old" is "primarily factual in nature and is based upon the totality of the circumstances of a given situation." *Id.* at 43, 107 S.Ct. at 2236. Finally, the Court noted that one of the factors to be considered when conducting any analysis is whether "the employees find themselves in essentially the same jobs." *Id.*

This court discussed the successor liability doctrine in the context of successor *labor* organizations in *Local Union No. 5741, United Mine Workers v. NLRB*, 865 F.2d 733 (6th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 88, 107 L.Ed.2d 53 (1989). In that case, we examined whether a local union was a "successor" union and was thereby responsible for the defunct local's unremedied unfair labor practice. We initially stated that "[t]he test of successorship, in the employer situation, is whether there is 'substantial continuity' between the enterprises." *Id.* at 736. We stressed that while we must examine all of the circumstances involved in each individual case, one of the most important considerations in successorship situations is "whether employees who have been retained will view their job situations as substantially unaltered." *Id.* In determining that the union in *Local Union No. 5741* was a successor union, we adopted the following list of factors to consider when applying the successor doctrine to unions:

'1) whether the successor union had notice of the liability;

2) the ability of the predecessor union to provide relief;

3) whether there has been a substantial continuity of the union's operations;

4) whether the successor union uses the same offices or encompasses the same jurisdiction;

5) whether the successor union has absorbed the predecessor's membership;

6) whether the officers of the predecessor union continued in some official capacity in the successor union;

7) whether the wages, terms and conditions of employment administered by the predecessor, as set forth in the collective bargaining agreement, are the same or substantially equivalent to those administered by the successor;

8) whether the members continue to pay dues and enjoy the same membership rights; and

9) whether the members continue to work at the same trade for the same or similar employers.'

*Id.* at 737 (quoting *EEOC v. Local 638, Sheet Metal Workers' Int'l Ass'n.*, 46 Emp. Prac.Dec. (CCH) ¶ 37,846 at 51,322 (S.D.N. Y.1988)).

In examining the facts in the instant action, we are guided by the Supreme Court's admonition in *Howard Johnson* that "in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate." 417 U.S. at 256, 94 S.Ct. at 2240. In this case, Local 7 "had notice" of the amount of dues that the members of the defunct unions had been paying. In addition, there was "a substantial continuity" of the defunct unions' operations since Local 7 encompasses the same territory covered by the defunct unions and Local 7 completely "absorbed" its predecessors' membership. Likewise, since all existing collective bargaining agreements of the old locals were expressly assumed by Local 7, the "wages, terms and conditions of employment ... are the same." Similarly, the building trade members of Local 7 continued to work at the same trade for the same employers and all Local 7 members enjoyed substantially unchanged membership rights in Local 7 because, upon transferring to Local 7, they received credit "for years of continuous good standing in their respective local unions." J.App. at 21 (Carlough Amalgamation Order). Finally, it appears that Carlough implicitly recognized that Local 7 was a successor union because, although he established a rate of dues for the building trade members of Local 7, the "rate for all other members ... [would] remain the same until reviewed by the Executive Board and Trustees *and their recommendation approved by the membership.*" J.App. at 23 (emphasis added). Therefore, applying the factors adopted by this court in *Local Union No. 5741* to the facts of this case, we hold that Local 7 was a successor union to the four defunct unions and reverse the district court's finding that Local 7 is in form or in substance a "new" union.

**B.**

■ Since Local 7 is not a new local, we must now determine whether Carlough's order constitutes a "dues increase" within the meaning of section 101. Section 101(a)(3)(A) does not specifically address whether a union member who is, in effect, transferred to a union with higher dues is entitled to vote whether to accept this "dues increase." In interpreting the LMRDA, the Supreme Court has cautioned " 'against a literal reading' of the LMRDA" because "[l]ike much federal labor legislation, the statute was 'the product of conflict and compromise between strongly held and opposed views, and its proper construction frequently requires consideration of its wording against the background of its legislative history and in the light of the general objectives Congress sought to achieve.' " *Local No. 82, Furniture & Piano Moving, Etc. v. Crowley*, 467 U.S. 526, 541–42, 104 S.Ct. 2557, 2566–67, 81 L.Ed.2d 457 (1984) (citing *Wirtz v. Glass Bottle Blowers Assn.*, 389 U.S. 463, 468, 88 S.Ct. 643, 646, 19 L.Ed.2d 705 (1968)). Likewise, the *Crowley* Court observed that since many sections in the LMRDA " 'contain calculated ambiguities or political compromises [which were] essential to securing a majority[,] ... in resolving them the courts would be well advised to seek out the underlying rationale without placing great emphasis upon close construction of the words.' " *Id.* at 542 n. 17, 104 S.Ct. at 2566 n. 17 (citing Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959*, 58 Mich.L.Rev. 819, 852 (1960)). Finally, the Supreme Court has consistently stressed that the "basic objective of the LMRDA" was to ensure that " 'unions [are] democratically governed and responsive to the will of their memberships.' " *Sheet Metal Workers' International Association v. Lynn*, 488 U.S. 347, 109 S.Ct. 639, 643, 102 L.Ed.2d 700 (1989) (citing *Finnegan v. Leu,* 456 U.S. 431, 436, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982)).

*See also* S.Rep. No. 187, 86th Cong., 1st Sess., *reprinted in* 1959 U.S.Code Cong. & Admin.News 2318, 2323 ("Union members have a vital interest ... in the policies and conduct of union affairs. To the extent that union procedures are democratic they permit the individual to share in the formulation of union policy.")

In examining the facts of the instant case, we note that whether Local 7's dues rate is called a new rate, an "increase," or a change, the rate that the individual union members paid in the old locals was lower than the rate assessed by Local 7. While we do not question Carlough's motives in merging the four unions or in setting Local 7's operating budget at $90,000.00, the "entire economic impact" of the higher rate of dues assessed by Local 7 "was upon the pocketbooks of [the same] Union members." *Sertic v. Cuyahoga, Lake, Geauga & Ashtabula Counties Carpenter District Council,* 423 F.2d 515, 521 (6th Cir.1970). Since Local 7 is a successor union to the four merged unions, since Local 7 was aware of the dues rates of the defunct unions and since Carlough implicitly recognized that this was a dues increase when he permitted the non-building trade members to vote whether to approve any increase, we hold that Carlough's action constituted a dues increase within the meaning of section 101. Because section 101 requires that all dues increases be approved by a majority vote of the members, we affirm the district court's finding that section 101 gave the members the right to vote on Carlough's proposed dues increase.

▪ Although we find that Carlough's action in this case constituted a dues increase within the meaning of section 101, we reject the plaintiffs' contention that every time a union official merges two or more unions, the resulting dues rate is a *per se* increase. As a practical matter, if Carlough had enacted a dues rate which was *lower* than the rates union members paid to their old locals, the Local 7 members would have undoubtedly approved this rate. Thus, we hold that where a proposed dues rate constitutes an increase for *more than a majority* of the members of merged locals, the rate is an increase within the meaning of section 101 and the members have the right to vote on the proposed dues increase.

▪ Since Carlough's rate constituted an increase for the majority of the members of Local 7, they were entitled to vote on that proposal. In this case, Local 7 members were allowed to vote on Carlough's proposed rate; to reject Carlough's proposal; to approve another rate; and then to reject the dues rate which they adopted to replace Carlough's proposed rate. However, we recognize that the members were not allowed to vote for "no increase," for the Bastin proposal or for any other dues proposal. As such, the circumstances surrounding this vote are somewhat similar to the situation presented in *Sertic,* where this court decided "whether the use ... of an issue containing both an increase in dues and a wage increase violates the" LMRDA. 423 F.2d at 521.

Although *Sertic* states that combining a wage increase with a dues increase violates the LMRDA, we find that *Sertic* is distinguishable from the facts in this case. In *Sertic,* the members were not given the option of voting "yes" for a wage increase without also voting "yes" on a dues increase. In contrast, the plaintiffs in this case were in no way coerced into voting for any of the dues proposals. Indeed, if one third of the members had voted for *each* proposal at the May 31 meeting, none of the proposals would have received a majority vote, Carlough's proposed rate would have remained in effect, the section 101 violation would have continued, and another vote would have been required. Therefore, because section 101's goal of allowing democratic rule by union members was achieved in this case, we hold that, as of June 11, 1986, when the members rejected Carlough's proposal and adopted another

dues rate, the section 101 violation was remedied.[1]

By holding that Carlough's action constitutes a dues increase within the meaning of section 101, we do not suggest that Carlough acted in bad faith in implementing an initial dues rate for Local 7. However, we are guided by the legislative history of section 101 which evidences a concern that unscrupulous union leaders might make decisions which are against the best interest of the individual union members. *See, e.g.,* H.R.Rep. No. 741, 86th Cong., 1st Sess., reprinted in 1959 U.S.Code Cong. & Admin. News 2318, 2428 ("The relationship of leaders of such unions to their members has in some instances become impersonal and autocratic. In some cases persons who have acquired positions of power and responsibility within unions have abused their power and forsaken their responsibilities to the membership and to the public.") Therefore, the potential exists that a union leader might merge two or more existing unions into a "new" union, then implement a dues rate for the new union which would have been impermissible, absent a membership vote, for the old locals. Accordingly, irrespective of Carlough's motives, we conclude that while Carlough's actions constituted a dues increase within the meaning of section 101, the first union dues vote remedied the section 101 violation.

### III.

■ Finally, we reject the plaintiffs' argument that any rate which Carlough established which was over the constitutional minimum was a *per se* increase. We recognize that the Supreme Court in *American Federation of Musicians of the United States and Canada v. Wittstein,* 379 U.S. 171, 85 S.Ct. 300, 13 L.Ed.2d 214 (1964), stressed that the purpose of the LMRDA was "that there should be full and active participation by the rank and file in the affairs of the union." *Id.* at 182–83, 85 S.Ct. at 306–07. However, because the union members had previously agreed to dues rates which were greater than the constitutional minimum, (*i.e.,* the rates which they paid to their old locals), we conclude in this case that Carlough was not prohibited from imposing a rate over the International's constitutional minimum.

### IV.

■ The final issue we must decide is that of damages. The district court ordered "[t]hat damages should be calculated based on the excess monthly dues collected over constitutional minimum of two hours' wages until such time as the membership is given an unrestricted opportunity to propose and vote upon a rate of dues in excess of the constitutional minimum." J.App. at 43. Because the members had previously approved dues rates which were higher than the constitutional minimum, we hold that these rates are the appropriate rates to use to assess damages. Thus, damages should be assessed based on the difference between the rate imposed by Carlough and the rates which the members paid to the old locals, and damages should be assessed from the time the members paid the higher rates until the members approved a new rate in June 1986.

### V.

For the reasons discussed above, we AFFIRM in part, REVERSE in part and REMAND for a damage calculation consistent with this opinion.

---

1. We note that neither International's constitution nor the legislative history of section 101 indicates that individual union members have the unfettered right to make dues proposals at membership meetings. Indeed, the legislative history notes that "in order to have democratically responsive unions, it is [not] necessary to have each union member make decisions on detail as in a New England town meeting. What is required is the opportunity to influence policy and leadership by free and periodic elections." S.Rep. No. 187, 86th Cong., 1st Sess., *reprinted in* 1959 U.S.Code Cong. & Admin. News 2318, 2323. This was accomplished by the procedures employed in the case at bar.

**918**

KENNEDY, Circuit Judge, concurring.

I concur in the panel's opinion but write separately because I do not believe the opinion makes clear that all members of the merged locals were obligated to pay the same dues after the merger even though some members may be paying more in dues than they paid their former local. Because we do not know the number of members in each of the former locals, we are unable to determine the dues rate of a majority of those members. Thus we are unable to determine whether the rate set by Carlough exceeded that paid by a majority to their former locals. Carlough set the dues rate at $30.00 plus 2% of all hours worked. There was some estimate that this would amount to $70.00 a month. The former locals had rates of $47.25, $50.00, $55.75, $60.00 and $30.00 plus $.15 per hour worked.